**GOLDEN RULE INSURANCE COMPANY, Plaintiff,**

v.

**Don W. STEPHENS, et al., Defendants.**

No. 94–125.

United States District Court,
E.D. Kentucky,
Covington Division.

Nov. 2, 1995.

Jeffrey C. Mando, Adams, Brooking, Stepner, Woltermann & Dusing, Covington, KY, Curtis J. Dickinson, Dickinson & Associates, Indianapolis, IN, for Plaintiff.

E.D. Klatte, Cabinet for Human Resources, Commonwealth of Kentucky, Frankfort, KY, Garrick F. Cole, Paul W. Johnson, Smith, Duggan & Johnson, Boston, MA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERTELSMAN, Chief Judge:

Plaintiff, the Golden Rule Insurance Company, challenges the constitutionality of provisions of House Bill 250 ("HB 250"), a comprehensive health care reform measure enacted by the Kentucky Legislature. The matter was tried to the court, sitting without a jury, on May 30 and 31, 1995 and July 28, 1995.

### FINDINGS OF FACT

#### A. The Act

On April 15, 1994, the Kentucky General Assembly enacted HB 250. The Act creates the Kentucky Health Policy Board ("the Board"), an independent agency of state government, and states that "[t]he goal of the board shall be to control health care costs, improve quality and efficiency, encourage competition, and develop a system of integrated health care delivery which makes necessary health services available to all residents of the Commonwealth." HB 250 § 2(1).

The Board is statutorily empowered to develop a listing of minimum health benefits which must be offered by all insurance companies doing business in Kentucky. HB 250 § 59. The Board has adopted four standard benefit plans which provide Kentucky residents with 28 or 29 different options for insurance coverage. Each of the four standard plans has an indemnity version (traditional insurance coverage) and a managed care version (health maintenance organizations), and each provides a high and low coverage option for both the indemnity and managed health care plans.

The Act provides that all health insurance policies issued or renewed on or after the Act's effective date shall be "guaranteed issued," that is, an applicant for insurance may not be denied coverage based on his or her health. In addition, an insurance company may not exclude any preexisting condition from coverage, but the insurer is not required to provide coverage for expenses incurred for treatment of the preexisting condition for the first six months of the policy's coverage. HB 250 § 54(2)(a).

The Act also provides for "portability of coverage." This means that any insured who obtains new coverage within 60 days after previous insurance has terminated may have the prior coverage credited to any preexisting condition limitation in the new plan. HB 250 § 54(2)(b). In other words, the six month exclusion for preexisting conditions is not applicable if the insured served the six

month exclusion term under a previous policy.

All policies issued or renewed after July 15, 1995, must also be "guaranteed renewable." Section 54(1) of the Act requires that all policies be renewed at the insured's option unless required premiums have not been paid, the insured is guilty of fraud or misrepresentation, or the insurer ceases to do business in Kentucky.

Insurance premiums are established by the insurance companies, subject to state approval, based on a modified community rating. Under the modified community rating, the insurance company bases premiums on objective factors such as age, geography, family composition and benefit plan design.

The Act also creates a "Health Purchasing Alliance" which operates as a statewide purchaser of health care services. Participation in the alliance is mandatory for most state employees, but it is voluntary for employers with 100 or fewer employees and for individuals.

The alliance has authority to accept bids from and to enter into agreements with insurance companies to obtain group coverage for Alliance members. It is anticipated that the Purchasing Alliance will be able to secure lower premium rates through its negotiating power.

Finally, the Act provides for a "risk adjustment procedure," under which an insurance company may apply to the Board for reimbursement of losses. The fund from which an insurer is reimbursed is funded from mandatory contributions paid quarterly by the insurance companies and is administered by the Health Purchasing Alliance.

Numerous types of insurance are exempted from the provisions of HB 250. The Act does not cover insurance provided through Medicare or Medicaid, does not regulate self-insurers, and does not affect insurance coverage provided by out-of-state employers under a group plan, where the plan was purchased out-of-state and the majority of the employer's employees reside outside the Commonwealth. In addition, the Board exempted all guaranteed renewable policies issued before January 1, 1994, from the definition of health benefit plan.

## B. Plaintiff's Claims

Golden Rule Insurance Company is an Illinois corporation which has been engaged in the business of providing health insurance to Kentucky residents since 1978. Golden Rule issues two types of policies to residents of Kentucky: individual major medical policies; and group major medical insurance in the form of a Master Policy issued to an Illinois association, the Federation of American Consumers and Travelers ("FACT"). The group policy is issued in Illinois; Kentucky FACT members are provided with a certificate which evidences the insurance coverage.

Golden Rule has issued approximately 1,034 individual insurance policies to Kentucky residents under which it insures approximately 1,969 Kentuckians. Golden Rule provides insurance to an additional 9,398 Kentucky citizens under the 4,972 certificates issued through the Illinois association. For the twelve month period ending in January, 1995, Golden Rule collected $10,717,414 in earned premiums under the individual and FACT policies. *See* Plaintiff's Ex. 9.

Golden Rule's ability to cancel coverage under both the individual policies and the Illinois Master Policy is limited. The renewal provision in the individual policies generally provides:

> You may keep this *policy* in force for life by timely payment of the premiums. However, we may refuse renewal if: (1) we refuse to renew all policies issued on this form, with the same type and level of benefits, to residents of the state where you then live; or (2) there is fraud or a material misrepresentation. . . . We will not refuse renewal for reason (1) above except on an anniversary of the policy's effective date, or the next following due date if the anniversary date is not also a premium due date. We may refuse renewal for reason (2) above as of any premium due date.

> \* \* \* \* \* \*

This policy is renewable for life, subject only to the two conditions set forth in the

renewal clause and our right to change premiums.

(emphasis in original).

Golden Rule's group major medical policy issued through the Federation of American Consumers and Travelers provides that it may only be terminated as follows:

This *policy* is issued for an indefinite term, beginning on the effective date of the *policy* shown on the *face page*. The *policy* continues in force, so long as premiums are paid when due, until terminated according to the following paragraphs.

\*   \*   \*   \*   \*   \*

*We* may terminate any or all of the insurance under this *policy,* as of any premium due date, by giving written notice to the policyholder and affected members at least 30 days prior to that date. *We* will not terminate *your* certificate, unless *we* terminate all certificates just like *your[s],* issued under the *policy* to those then residing in *your* state.

(emphasis in original).

Golden Rule "underwrites" its policies. Through this process, the company is able to select low risk insureds using actuarial principles and standards, such as the establishment of rates based upon risk classifications in force at the time the policy is issued, the claims experience of a group of insureds, the deductible, the family composition, geographic location and age of the insureds. The premiums for the certificate holders of the Illinois association are based on a nationwide experience of all certificate holders. Premium increases are across the board for a given "block of business."

It is important to understand the concept of a "block of business." As described in the testimony and evidence, a "block of business" is a group of insureds insured under a given policy form. When a new policy form is introduced, a group of insureds is written under it. This group is highly "underwritten." That is, carefully screened to insure good health and low risk. After the initial underwriting, no additional insureds may join this block of insurance.

Initially, the insurer's profit on the block is very high. As the block ages and its mem-bers become sick, age, or decline to continue coverage the insurance experience worsens. When it reaches a certain point, the Company can either raise premiums until the entire block declines the coverage or cancel the entire policy form.

It is critical to understand that the above quoted policy provisions do not require the company to cancel all policies in the state to divest itself of insureds that have become risky. Rather, the company need only cancel the policy form for a given block of business.

As a result, the average life of a Golden Rule health policy is three years. Therefore, to describe Golden Rule's policies as "guaranteed renewable" is at best highly illusory.

Golden Rule does not challenge the Commonwealth's ability to prospectively regulate the insurance industry within Kentucky. Rather, Golden Rule limits its constitutional challenge to the Commonwealth's ability to apply the provisions of HB 250 to policies issued before the Act's effective date but renewed thereafter.

Golden Rule's expert witness, Randall Suttles, the company's senior vice-president and chief financial officer, estimated that the company would suffer a loss of between four and five million dollars, over an expected 20–year life span of policies currently in force, if it was forced to nonrenew these policies. In addition, Suttles testified that if Golden Rule cannot use standard underwriting practices to set rates and is required to offer insurance on a guaranteed issue basis, Golden Rule's policyholders will experience a 50% increase in premiums to obtain the same type of coverage.

In plaintiff's post-trial memorandum, Golden Rule raises the following arguments: (1) the Act should not be interpreted to apply retroactively to policies or certificates that existed on July 15, 1995, but are renewed thereafter; (2) the Act should not be interpreted to prevent renewal of the FACT certificates since this would constitute an extraterritorial application; (3) the Act violates the Contracts Clause; (4) the Act violates the Takings Clause and the Due Process Clause; and (5) Golden Rule is entitled to relief under 42 U.S.C. §§ 1983 and 1985. For the rea-

sons set forth below, Golden Rule's contentions are without merit.

## CONCLUSIONS OF LAW

The court will address the plaintiff's arguments seriatim:

### A. The Act is not Retroactive

■ Golden Rule argues that the Act is improperly retroactive if interpreted to prevent continuation of contracts that exist on July 15, 1995, but are renewed after that date. This argument need not long detain us.

Section 59(2)(a) of HB 250, by its terms, prohibits insurers, after July 15, 1995, from issuing or renewing health benefit plans other than the standard plans that the board has promulgated. The statute does not apply retroactively because it simply requires insurers to conform their conduct *after* July 15, 1995 to the terms of HB 250. It does not affect any rights or actions prior to that date.

Golden Rule contends that, since the contracts that exist prior to July 15, 1995 but are renewed at a later date provide for automatic renewal subject to contractually stated conditions, the renewals constitute a mere extension of an existing contract rather than the formation of a new contract. Therefore, according to Golden Rule, application of HB 250 to those contracts constitutes retroactive application of the statute.

■ In this case, the plaintiff admits that "[t]he express, stated conditions in the policies and certificates allow Golden Rule to nonrenew the policy only if there is fraud or material misrepresentation or if Golden Rule nonrenews all policies on the same form or all certificates then existing in the entire state." Doc. # 155; *see also* Suttles, Trial Tr., Vol. 1, pp. 100–101. In addition, Golden Rule retains the right to unilaterally increase premiums on certain specified dates. Because Golden Rule retains these options, the court holds that a novation in the insurance contract occurs on each renewal date. *See Blue Cross and Blue Shield v. Bell,* 798 F.2d 1331, 1337 (10th Cir.1986) (Where statutes apply "only to contracts of insurance issued or renewed [after the effective date of the statute], no sudden, totally unanticipated,

and substantially retroactive obligation burdens these contractual relationships."); *see also Moore v. Metropolitan Life Ins. Co.,* 33 N.Y.2d 304, 352 N.Y.S.2d 433, 307 N.E.2d 554 (1973) (regulations effective upon future renewal not retroactive); *Insurers' Action Council, Inc. v. Markman,* 490 F.Supp. 921 (D.Minn.1980) (distinguishing between the continuous contracts caused by renewal of non-cancelable and guaranteed renewal policies and the new and separate contracts created by the renewal of non-renewal for stated reasons only policies). Therefore, application of § 59 to policies and certificates issued before July 15, 1995 but renewed thereafter does not make the Act retroactive.

### B. The Act Does Not Have Extraterritorial Effect

■ Golden Rule argues that to prevent it from renewing its in-state certificates for the Illinois master policy constitutes an extraterritorial effect. However, as the above statement of facts makes clear, the Act has no effect on the Illinois master policy. Instead, the Act affects only the in-state certificates issued pursuant to the Illinois master policy.

### C. The Act Does Not Violate the Contracts Clause

■ The Constitution of the United States prohibits the states from enacting any "Law impairing the Obligation of Contracts...." U.S. Const. Art. 1, § 10, cl. 1. Interpretation of this clause has varied over the nation's history as various exigencies have arisen. Epstein, *Toward a Revitalization of the Contracts Clause,* 51 U.Chi.L.Rev. 703 (1984); Kmiec & McGinnis, *The Contracts Clause: A Return to the Original Understanding,* 14 Hastings Const. L.Q. 525 (1987). For the sake of brevity, we will consider only the most recent cases.

■ The Supreme Court has developed a three-part test to determine whether the application of a state statute results in an unconstitutional impairment of a contract. First, the court must evaluate "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Pow-*

*er and Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)); *American Republic Ins. Co. v. Superintendent of Ins.,* 647 A.2d 1195 (Me. 1994). The level of scrutiny to which the legislation will be subjected increases as the severity of the impairment increases. *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704; *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). In determining the extent of the impairment, the court must take into consideration whether the industry the complaining party has voluntarily entered has been regulated in the past. *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704. Substantial weight must be given to the heavily regulated industry context in the Contracts Clause analysis. *Id.; see* Note, *The Constitution, the Legislature, and Unfair Surprise: Toward a Reliance–Based Approach to the Contract Clause,* 92 Mich.L.Rev. 398 (1993).

Second, if the statute has substantially impaired a contractual relationship, the state "must have a significant and legitimate public purpose" to justify the statute, "such as the remedying of a broad and general social or economic problem." *Energy Reserves,* 459 U.S. at 411–412, 103 S.Ct. at 704–705; *American Republic,* 647 A.2d at 1197. The legitimate public purpose requirement "guarantees that the .State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. at 705.

Third, once a legitimate public purpose has been identified, the court must determine whether the adjustment of contractual rights and responsibilities caused by the statute "is based on reasonable conditions and is 'of a character appropriate' to the purpose" of the statute. *American Republic,* 647 A.2d at 1198 (quoting *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. at 705). Unless the state is a contracting party, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves,* 459 U.S. at 413, 103 S.Ct. at 705 (quoting *United States Trust Co. v.*

*New Jersey,* 431 U.S. 1, 22–23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977)).

In this case, plaintiffs have been unable to establish that the Act has substantially impaired an existing contractual relationship. In determining whether there was an existing contractual relationship in this case, the court must consider whether renewal of an existing insurance contract constitutes a continuation of the contract or the execution of a new and separate contract.

As stated above, the court holds that each renewal is a novation. Indeed, the court has difficulty identifying any obligation of contract the insured owes to Golden Rule under its policies and certificates. The insured is not obliged to continue the contract but may cancel on any renewal date. An insured might complain that the Company has an obligation to him or her, but the court need not address that argument since no insured has appeared herein to raise that issue.

What Golden Rule is really complaining about is that the Act prohibits it from *making* the type of contracts it finds highly profitable, insuring intensely underwritten "blocks of business." However, the Supreme Court has made clear that one whose activities are subject to state regulation "cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–242, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978).

In addition, the court views the severity of the impairment of any contractual obligations or interference with the contractual relationships herein as minimal. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. *Allied Structural Steel,* 438 U.S. at 245, 98 S.Ct. at 2722–2723.

That is the case here. The court holds that there is little or no interference with existing contractual relationships under this Act. Rather, it regulates the formation of contracts in a highly regulated industry in the future.

Although the court holds that there is only minimal interference with contractual relationships and the inquiry may end there, to expedite appellate review the court further holds that, even if the Act substantially impaired the plaintiffs' contractual relationships, application of the Act to the contracts at issue would not violate the Contracts Clause. The state has identified a significant and legitimate public purpose to justify the statute, i.e., "to control health care costs, improve quality and efficiency, encourage competition, and develop a system of integrated health care delivery which makes necessary health services available to all residents of the Commonwealth." HB 250 § 2(1). In addition, the Access Subcommittee Report documented various problems with the prior system of health care delivery and insurance within the Commonwealth which HB 250 is intended to remedy. Def. Exh. 99, pp. 2–7.

Third, as a legitimate public purpose has been identified, the court concludes that any adjustment of contractual rights and responsibilities caused by the statute is based on reasonable conditions and is of a character appropriate to that purpose. The court need not agree that HB 250 will ultimately accomplish the goal of the legislature to provide better and less expensive health insurance to Kentucky residents because the court properly defers to the judgment of the legislature as to the necessity and reasonableness of this measure. The plaintiff makes many arguments concerning the fiscal fallacies it perceives in the Act, but the court has no power to second guess the legislature as long as the Act has a rational basis. See discussion, *infra.* Accordingly, plaintiffs' Contracts Clause claim is without merit.

## D. The Act Does Not Violate the Due Process Clause

The Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." The "test" of due process is whether a statute has "a legitimate legislative purpose furthered by rational means." *General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992); *see also Horsemen's Benevolent & Protective Association, Inc. v. Turfway Park Racing.Association, Inc.,* 20 F.3d 1406 (6th Cir.1994). "Because 'legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality,' ... 'judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches'...." *Horsemen's Benevolent & Protective Association,* 20 F.3d at 1414.

As explained above, HB 250 is designed to control health care costs, improve quality and efficiency, encourage competition, and develop a system of integrated health care delivery which makes necessary health services available to all residents of the Commonwealth. This is a legitimate legislative purpose, and HB 250 is the rational means by which this purpose is furthered, in the judgment of the Legislature. Accordingly, plaintiff's Due Process claim is without merit.

## E. The Act Does Not Violate the Takings Clause

The Fifth Amendment mandates that "[n]o person shall be ... deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." This prohibition is made applicable to the states by the Fourteenth Amendment. *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

To establish a claim under the Takings Clause, a plaintiff must establish that:

1. Governmental action amounted to a taking of his property;

2. The taking did not advance a legitimate governmental interest; and

3. There was no just compensation for the taking.

*See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Hall v. City of Santa Barbara,* 797 F.2d 1493 (9th Cir.1986).

The requirement of HB 250 § 59(2)(a) that health insurance plans may not be renewed after the effective date of the Act unless they conform to the standard plans does not deprive the plaintiff of any "property" within the meaning of the Takings Clause. As one court has summarized:

> "Property" within the meaning of the just compensation clause is "the group of rights inhering in the citizen's relation to [a] physical thing." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). It presupposes "the presence of a legally enforceable and recognizable interest in distinct property." *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1275 (7th Cir.1983). "Property" under the just compensation clause must consist of more than a mere contractual expectation.

*Evanston Ins. Co. v. Merin*, 598 F.Supp. 1290, 1316 (D.N.J.1984).

As established above, the plaintiff has not suffered a loss of property because the plaintiff possessed no more than an expectation that the policies and certificates at issue may be renewed. The renewal of the policies was not automatic. The Act is in the nature of economic regulation rather than a taking. Therefore, plaintiffs have failed to establish a cognizable claim under the Takings Clause.

### F. The Act Does Not Violate 42 U.S.C. § 1983

Plaintiff alleges that it is entitled to compensation and attorneys' fees under 42 U.S.C. §§ 1983 and 1988 because defendants' application of HB 250 to the contracts at issue violates plaintiff's constitutional rights. As explained above, the plaintiff has not established a violation of any constitutional rights. Accordingly, plaintiff's §§ 1983 and 1988 claims are without merit.

Accordingly, this court concludes that the defendants are entitled to judgment on all of plaintiff's claims in this matter.