RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2017-SC-000233-DG

DATE 11/26/18 Kim Redmon, DC

BETH LEWIS MAZE AND
UNKNOWN SIMILARLY SITUATED
PURCHASERS OF KAPT CONTRACTS

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2016-CA-000496-MR
FRANKLIN CIRCUIT COURT NO. 15-CI-00757

BOARD OF DIRECTORS FOR THE
COMMONWEALTH POSTSECONDARY
EDUCATION PREPAID TUITION TRUST
FUND; DAVID L. ALLEN, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE BOARD
OF DIRECTORS; JOHN CHESHIRE, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF
THE BOARD OF DIRECTORS; CHARLES
VINSON, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE BOARD OF DIRECTORS;
ERICA L. HORN, IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE BOARD
OF DIRECTORS; BECKY LAMB, IN HER
OFFICIAL CAPACITY AS A MEMBER OF
THE BOARD OF DIRECTORS; BRENT A.
MCKIM, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE BOARD OF
DIRECTORS; KRISTI P. NELSON, IN HER
OFFICIAL CAPACITY AS A MEMBER OF
THE BOARD OF DIRECTORS; LISA PAYNE,
IN HER OFFICIAL CAPACITY AS A
MEMBER OF THE BOARD OF DIRECTORS;
BARBARA SEXTON-SMITH, IN HER
OFFICIAL CAPACITY AS A MEMBER OF
THE BOARD OF DIRECTORS; J. SCOTT
WANTLAND, IN HIS OFFICIAL CAPACITY
AS A MEMBER OF THE BOARD OF
DIRECTORS; DR. GARY S. COX, IN HIS

APPELLEES

OFFICIAL CAPACITY AS AN EX OFFICIO
MEMBER OF THE BOARD OF DIRECTORS;
DR. TODD HOLLENBACH, IN HIS OFFICIAL
CAPACITY AS AN EX OFFICIO MEMBER
OF THE BOARD OF DIRECTORS; DR.
TERRY HOLLIDAY, IN HIS OFFICIAL
CAPACITY AS AN EX OFFICIO MEMBER OF
THE BOARD OF DIRECTORS; DR ROBERT
KING, IN HIS OFFICIAL CAPACITY AS AN
EX OFFICIO MEMBER OF THE BOARD OF
DIRECTORS; DR. LORI FLANERY, IN HER
OFFICIAL CAPACITY AS AN EX OFFICIO
MEMBER OF THE BOARD OF DIRECTORS;
KENTUCKY HIGHER EDUCATION
ASSISTANCE AUTHORITY; AND THE
COMMONWEALTH OF KENTUCKY,
FINANCE AND ADMINISTRATION CABINET

## OPINION OF THE COURT BY JUSTICE VENTERS

### REVERSING

Beth Lewis Maze, et al. (Appellants)[1] appeal from a decision of the Court

of Appeals which reversed the order of the Franklin Circuit Court that granted

partial summary judgment to Appellants in a dispute concerning various

statutory amendments to the Kentucky Affordable Prepaid Tuition Fund (KAPT)

contracts previously purchased by the Appellants. Appellees are the Board of

Directors for the Commonwealth Postsecondary Education Prepaid Tuition

Trust Fund (Board) and its individual members named in their official

---

[1] The Complaint and Petition for Declaratory Judgment listed as additional plaintiffs, "Unknown Similarly Situated Purchasers of KAPT Contracts." The Motion for Discretionary Review identified same as Appellants. This provision in Maze's complaint seemingly implicates our class-action litigation rules, CR 23. Appellees did not object to Maze's assertion of claims for unknown KAPT participants. The supposed class-action nature of the lawsuit is not an issue before us.

capacities; the Kentucky Higher Education Assistance Authority; and the Finance and Administration Cabinet.

The Court of Appeals disagreed with the trial court's legal conclusion regarding the retroactive application of the 2014 statutory changes affecting the 2003 contracts for prepaid college tuition entered into by Maze and the Board. The Court of Appeals interpreted those contracts as providing, in association with their enabling statutes, that KAPT participants like Maze, and others similarly situated, had expressly agreed to be bound by amendments to the contracts imposed by future statutory and regulatory changes. The Court of Appeals thus concluded that the 2014 amendments validly altered Appellants' contracts. The Court of Appeals reversed the trial court and held that the Appellees, rather than Maze, should have been granted summary judgment as a matter of law.

For the reasons stated below, we conclude that the KAPT contracts executed by Maze and those similarly situated, and the underlying enabling statutes, do not authorize the contractual changes imposed by the retroactive application of the statutory amendments involved here, and that the retroactive imposition of those amendments upon Maze unlawfully impairs her contracts in violation of U.S. Const. Art. I § 10, cl. 1. and Ky. Const. § 19. Accordingly, we reverse the Court of Appeals and reinstate the judgment of the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts are not in dispute and may be summarized as follows. In 2000, the Kentucky General Assembly enacted KRS 164A.700-164A.709,

3

establishing the Commonwealth Postsecondary Education Prepaid Tuition Trust Fund, also known as the Kentucky Affordable Prepaid Tuition Fund, or KAPT. This program allowed and encouraged Kentucky families with pre-college aged children to contract with the KAPT Board to "lock in" the current tuition rates for future attendance at a public university in Kentucky.[2] Allowing the prepayment of college tuition permitted the parents of young children to insure against future increases in tuition rates. KRS 164A.701(2)(b) identifies KAPT's primary goal as, "provid[ing] students and their parents economic protection against rising tuition costs." In addition to the statutory provisions of KRS Chapter 164A, KAPT contracts are governed by the KAPT "Master Agreement" whose provisions track the enabling statutory language, generally providing that a contract participant will be guaranteed the state college tuition rate existing at the time the participant entered into the program.

Of crucial significance to our analysis, KRS 164A.705(1) expresses an unequivocal assurance to plan participants that they will receive the benefits they purchased as promised: "The prepaid tuition contract entered into by the purchaser and the board shall constitute an irrevocable pledge and guarantee by the fund to pay for the tuition of a qualified beneficiary upon acceptance

---

[2] KAPT's informational material stated that fund balances could also be used to attend private and out-of-state universities, and that any unused funds would be refunded to the contract participant. And so, the benefits of KAPT are not limited to Kentucky's public universities.

4

and enrollment at an eligible educational institution in accordance with the tuition plan purchased."

In January 2003, Maze purchased a KAPT "Standard Plan" contract for the benefit of each of her three sons. She listed their Projected College Entrance Years (PCEY) as 2008, 2010, and 2013, respectively. The Standard Plan contracts permitted purchasers to pre-pay at the time of purchase up to five years of tuition at the then-current cost of full-time tuition at Kentucky's most expensive public university. The payments could be paid in a single lump sum, or through a monthly payment plan. The Plan covered both undergraduate and graduate school tuition.

With those purchases, Maze entered into a Master Agreement which incorporated "the terms and provisions of KAPT Regulations and KRS 164A.700-709, as may be amended from time to time." At the time of Maze's purchase, neither the KAPT contracts themselves nor the statutes governing KAPT contained a time limitation within which the prepaid tuition must be used; nor did the contracts and governing statutes provide a time limit after which the plan would cover something less than the full cost of tuition at any of Kentucky's public universities. Maze fulfilled all of her obligations under the KAPT agreements. When their time of college enrollment came, two of Maze's sons received substantial academic scholarships, and they did not need immediate use of their prepaid tuition. They intended to apply their KAPT funds toward graduate school tuition.

5

## 2014 Legislative Changes

In 2014, with the enactment of House Bill 279, the General Assembly made several significant changes to the KAPT program that affected the contracts Maze had purchased eleven years earlier. Among the amendments was the imposition of a newly devised "utilization period," which for the first time imposed time limitations upon the KAPT contracts. The legislation defined the "utilization period" as "the period of time in which a prepaid tuition contract is to be used beginning with the projected college year and continuing for the number of prepaid tuition years purchased." KRS 164A.700(18).

The statutorily imposed condition operated retroactively to cover the contracts that Maze, and others, had purchased and paid for. Under this new provision, a KAPT plan participant who had purchased four years of prepaid tuition, with a projected college entry year of 2008, would have to use up the prepaid tuition before the end of 2012. Under the statutory change, plan participants lost the option of reserving their use of prepaid tuition for tuition needs beyond the "utilization period."[3]

The statutory changes also added a limit on the extent to which a purchased plan would cover the inflation of future college tuition. Maze's KAPT contracts had no such limitation. House Bill (HB) 279 amended KRS 164A.705(7) to provide:

> During an account's utilization period, the value of the prepaid tuition account shall increase consistent with tuition rates for the

---

[3] The unused prepaid tuition would not be forfeited; the participant could withdraw the balance of funds not used within the utilization period.

applicable tuition plan and academic year. If all tuition benefits have not been used at the conclusion of [the utilization] period, the account value shall increase at a rate of three percent (3%) per annum or the applicable tuition plan value increase, whichever is less, for a period not to exceed two (2) additional years. No additional value shall be added to a prepaid tuition account after two (2) years past the utilization period [(2014 for Maze's oldest child)].

Finally, the 2014 amendments also set June 30, 2028 as the termination date of the KAPT program, requiring that any prepaid tuition not used by that date be refunded to the purchaser. KRS 164A.709(8).

These legislative actions appear to have been an attempt to correct for a significant miscalculation in the financial viability of the program from its inception. In the years following the creation of the KAPT program, college tuition for public universities in Kentucky increased at rates well beyond what was anticipated and well beyond the growth of the fund managed by the KAPT Board, resulting in a substantial unfunded liability in the program.

On July 14, 2015, Maze filed a Complaint and Petition, on behalf of herself and "Unknown Similarly Situated Purchasers of KAPT Contracts,"[4] seeking declaratory and injunctive relief against the enforcement of the 2014 amendments. At the time of her Complaint, unused KAPT funds remained available in all three of her accounts. Maze asserts that her sons intended to apply the funds in their KAPT accounts to their graduate school tuition, which would fall outside of the "utilization period" established under the 2014 KAPT amendments. Citing this provision and the newly imposed cap on the growth-

---

[4] See note 1.

7

rate value of her accounts, she alleges that the 2014 amendments to KAPT unconstitutionally impaired the value and obligations of her contracts with the Board.

The parties filed cross-motions for summary judgment. The trial court overruled the Board's motion and granted summary judgment to Maze. The trial court agreed with Maze that the language of the KAPT Master Agreement and its underlying enabling statutes do not demonstrate an intention of the parties that amendments of the kind enacted by the 2014 legislation would retroactively apply to their 2003 contract. Proceeding to the constitutional question, the trial court concluded that the 2014 amendments to KAPT were an unjustified and unconstitutional impairment of her contract rights under the Master Agreement.

In contrast, the Court of Appeals interpreted the applicable contracts as expressing the parties' agreement that subsequent amendments to the governing statutes and regulations would change the terms and conditions of their existing contracts, thus interpreting the retroactive application of the 2014 amendments as permissible. Accordingly, the Court of Appeals reversed the summary judgment granted to Maze and ordered the entry of judgment for the Board. We granted discretionary review.

## II. ANALYSIS

"Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Lewis v. B*

8

& *R Corporation*, 56 S.W.3d 432, 436 (Ky. App. 2001). Since no material issues of fact are in dispute, our review involves a *de novo* review of the applicable KAPT enabling statutes and the terms of the Master Agreement. CR 56.03.

The interpretation of a contract, including determining whether a contract is ambiguous, is a question of law to be determined *de novo* on appellate review. *Abney v. Nationwide Mutual Insurance Company*, 215 S.W.3d 699, 703 (Ky. 2006); *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694–95 (Ky. 2016).

Our review requires the interpretation of various KAPT statutory provisions contained in KRS Chapter 164A and contractual provisions contained in the Master Agreement. A basic rule of contract interpretation requires that preference be given to the "interpretation which gives a reasonable, lawful, and effective meaning to all the terms" over a reading "which leaves a part unreasonable, unlawful, or of no effect." *Comstock & Co., Inc. v. Becon Const. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994) (quoting Restatement (Second) of Contracts § 203(a) (1979)).

Moreover, "'in the absence of ambiguity, a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Wehr Constructors, Inc. v. Assurance Company of America*, 384 S.W.3d 680, 687 (Ky. 2012) (quoting *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)). "A contract is ambiguous if a reasonable person

9

would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corporation v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (citation omitted).

"When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions." *3D Enterprises Contracting Corporation v. Louisville and Jefferson County Metropolitan Sewer District*, 174 S.W.3d 440, 448 (Ky. 2005) (citation omitted). If the language is ambiguous, the court's primary objective is to effectuate the intentions of the parties. *Cantrell Supply, Inc. v. Liberty Mutual Insurance Company*, 94 S.W.3d 381, 384 (Ky. App. 2002). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney*, 215 S.W.3d at 703 (Ky. 2006) (quoting *Cantrell*, 94 S.W.3d at 385).

In construing a statute, it is fundamental that our foremost objective is to determine the legislature's intent in enacting the legislation. "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson County Metro Government*, 260 S.W.3d 777, 779 (Ky. 2008). That is, we construe a "statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous . . . ." *Western Kentucky Coal Co. v. Nall & Bailey*, 14 S.W.2d 400, 401–02 (Ky. 1929). Therefore, when a statute is unambiguous, we need not consider extrinsic evidence of legislative intent and public policy. *County Bd. of Educ. Jefferson County v. Southern Pac. Co.*, 9 S.W.2d 984, 986 (Ky. 1928). However, if the

10

statutory language is ambiguous, we will look to other sources to ascertain the legislature's meaning, such as legislative history and public policy considerations. *MPM Financial Group Inc. v. Morton*, 289 S.W.3d 193, 198 (Ky. 2009). Further, we "read the statute as a whole, and with other parts of the law of the Commonwealth, to ensure that our interpretation is logical in context." *Lichtenstein v. Barbanel*, 322 S.W.3d 27, 35 (Ky. 2010); *Pearce v. University of Louisville, by and through its Board of Trustees*, 448 S.W.3d 746, 749 (Ky. 2014).

## III. THE KAPT CONTRACTS EXECUTED BY THE PARTIES DO NOT CONFER THE UNLIMITED AUTHORITY TO THE LEGISLATURE TO RETROACTIVELY AMEND THE CONTRACTS

The Court of Appeals concluded, and the Appellees continue to argue, that the KAPT statutes and associated Master Agreement that existed in 2003 when Maze purchased her plans express her agreement to accept *any* subsequent legislative changes to the terms and conditions of the KAPT program, including the retroactive application of the 2014 legislative changes. Appellees contend that the 2014 amendments fall squarely within the language of the applicable 2003 KAPT statutes and associated Master Agreement.

If Appellees are correct in their construction of the relevant statutory and the Master Agreement language, our inquiry ends. If the plan participants had agreed that such changes would be accepted, the retroactive amendments would be clearly applicable. Maze's claim would fail, and we would not reach the constitutional question. Therefore, we begin our analysis with an examination of the text of the Master Agreement and the associated statutory

11

enabling language to see if the KAPT program includes provisions conferring broad discretion upon the legislature to amend the program and to impose retroactive application of those amendments.

## A. The Positions of the Parties and the Lower Courts

Kentucky law mandates that "[n]o law shall be construed to be retroactive, unless expressly so declared." KRS 446.080(3). *See also Jackson v. Evans*, 145 S.W.2d 1061, 1062 (Ky. 1940) ("A construction giving retroactive effect to a statute is not favored. Hence unless the intention is manifested that a legislative act shall have a retroactive effect, it is not so regarded.") (internal citations omitted).

Similarly, it is a generally accepted rule of construction that "changes in the law subsequent to the execution of a contract are not deemed to become part of [the] agreement unless its language clearly indicates such to have been [the] intention of [the] parties." *Kia Motors America, Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013) (citing 11 Richard A. Lord, *Williston on Contracts* § 30:23 (4th ed. 1990) and *Rutherford Farmers Coop. v. MTD Consumer Grp., Inc.*, 124 Fed. Appx. 918, 920 (6th Cir. 2005)). That is, "[c]ontracting parties are free to agree that their rights and duties will track the law as it changes, but because the terms of their bargain could be significantly altered, they must make their intent to do so clear." *Id.*

HB 279 expressly declared the retroactive application of the 2014 amendments. However, as explained, because the legislature's authority to retroactively impose such amendments upon existing contractual rights and

obligations is not unlimited, the retroactive language contained in the 2014 amendment is not immediately dispositive of the issues here.

The Appellees argue that by signing the Master Agreement, Maze expressly agreed that the General Assembly could amend the KAPT program and the Master Agreement at any time, and that those amendments could retroactively affect her KAPT contract. Crucial to this conclusion are two provisions of the Master Agreement: Article X Section 10.08 and Article II Section 2.09.

Article X Section 10.08 of the Master Agreement states:

Promulgation and Amendment of KAPT Regulations. Purchaser understands and agrees that, in consideration for the benefits afforded under the KAPT program, *changes to this Agreement may be necessary to assure the program's compliance with 26 U.S.C. 529 and related regulations. In such event, the Purchaser authorizes KAPT to amend this Agreement to the extent necessary to obtain federal income tax benefits.* Accordingly, the Board, on behalf of KAPT, shall promulgate such other Regulations and procedures and shall amend such KAPT Regulations as deemed appropriate or necessary by the Board to maintain compliance with 26 U.S.C. 529 and Kentucky law. Amendments to Regulations and procedures shall be incorporated into this Agreement, and the Purchaser and Qualified Beneficiary shall be subject to all such amendments. *Amendments to this Agreement shall be made with retroactive effect to the extent necessary to assure compliance with applicable state or federal law or regulations or to preserve favorable tax treatment of the KAPT program.*

(Emphasis added.)

Article II Section 2.09 provides as follows:

"Prepaid Tuition Contract" means this Agreement entered into by the Board and the Purchaser for the purchase of Prepaid Tuition for a Qualified Beneficiary to attend any Participating Institution, including without limitation, the terms and provisions of KAPT Regulations and KRS 164A.700-709, as may be amended from time to time. *In the event of any amendments to KAPT regulations,*

13

*Code Section 529, or state statute, this Agreement shall be amended consistent with any such changes, with retroactive effect or otherwise.*

(Emphasis added.)

In opposition to the Court of Appeals' conclusion, Maze argues that Section 10.08 supports her position because it expressly authorizes amendments to the KAPT agreement only as "*to the extent necessary to obtain federal income tax benefits.*" Maze points out that she agreed, pursuant to Section 10.08, only to the retroactive application of amendments "*to the extent necessary to assure compliance with applicable state or federal law or regulations or to preserve favorable tax treatment of the KAPT program.*" Because the 2014 amendments were not necessary for that stated purpose, they fall outside of this limited authorization provided in Section 10.08.

Maze argues, consistently with the trial court's ruling, that Sections 10.08 and 2.09 conflict with one another and do not express a clear intention of the parties to be bound by broad amendments like those contained in HB 279. Maze contends that the specificity of Section 10.08 with respect to the nature of allowable retroactive amendments to the KAPT agreement means that, under traditional rules of contract interpretation, it takes precedence over the more general amendment authority provided by Article II Section 2.09. Under her construction of the applicable provision, she consented to be bound only by amendments necessary "to assure compliance with applicable state or federal law or regulations or to preserve favorable tax treatment of the KAPT program."

14

Appellees argue that these provisions do not conflict, that Section 10.08 merely provides one specific reason to accept amendments to the Master Agreement, and that Section 2.09 demonstrates the parties' agreement that the Master Agreement, as a whole, would track changes in state law with retroactive effect.

The Court of Appeals relied heavily upon KRS 164A.707(9), a component of the original KAPT legislation that remained unchanged by the 2014 legislation. KRS 164A.707(9) states as follows:

> Each prepaid tuition contract is subject to, and shall incorporate by reference, *all operating procedures and policies* adopted by the board, the statutes governing prepaid tuition contracts in KRS 164A.700 to 164A.709 and 393.015, and administrative regulations promulgated thereunder. *Any amendments to statutes, administrative regulations, and operating procedures and policies shall automatically amend prepaid tuition contracts, with retroactive or prospective effect, as applicable.*

(emphasis added.)

According to the Court of Appeals, KRS 164A.707(9) "expresses the General Assembly's intent that amendments to the statutes and regulations regarding KAPT will have retroactive effect." Thus, the Court of Appeals construed this provision, incorporated into the original KAPT agreement, as a manifestation of the parties' intent for retroactive application of any statutory or regulatory amendments to the KAPT plan. The Court of Appeals reasoned that Section 10.08 operated "in addition to, and not in conflict with," Section 2.09's general provision concerning retroactivity; and that Section 10.08 merely describes one instance in which statutory amendments to the terms and conditions of the KAPT contract will apply retroactively. The Court of Appeals

15

reasoned that Maze's construction of the Master Agreement giving precedence to the specificity of Section 10.08 "would render Section 2.09 and its final sentence meaningless."

**B. Analysis**

As part of the KAPT program's legislative foundation, KRS 164A.705(1) expresses an unequivocal assurance to plan participants that they will receive all of the benefits they purchased: "The prepaid tuition contract entered into by the purchaser and the board shall constitute an irrevocable pledge and guarantee by the fund to pay for the tuition of a qualified beneficiary upon acceptance and enrollment at an eligible educational institution in accordance with the tuition plan purchased."

Ordinarily, no special written language is necessary to assure contracting parties that, if they perform their contractual obligations, they are entitled to receive the bargained for performance of the other party. The contract itself provides the assurance that a promise will be kept; that is inherent in the concept of a contract. KRS 164A.705(1) is the legislature's imprimatur of respect for KAPT's obligations. In light of KRS 164A.705(1)'s direct and unambiguous assurance that the benefits promised to KAPT plan purchasers will be delivered to KAPT plan purchasers, we find it impossible to conceive that the General Assembly would, in reality, assert the power to reduce the bargained-for benefit of KAPT program participants through subsequent modification authorized by the murky language of KRS 164A.707(9) for retroactive effect of statutory amendments, "as applicable." Under the

16

established rule that a statute is to be interpreted in accordance with its plain language, we will begin with the presumption that the retroactive 2014 amendments conflict with straight-forward "irrevocable pledge" language. The Court of Appeals' conclusion that Maze and her fellow KAPT plan participants agreed to a contractual provision giving the legislature *carte blanche* authority to retroactively modify KAPT plans at its discretion is contrary to the "irrevocable pledge" language contained in KRS 164A.705(1).

In reaching this interpretation, we also follow the doctrine of "*contra proferentem*: When interpreting contracts susceptible to two meanings, we construe ambiguity against the drafter . . . ." *Majestic Oaks Homeowners Association, Inc. v. Majestic Oaks Farms, Inc.*, 530 S.W.3d 435, 441 (Ky. 2017) (citing *B. Perini & Sons v. Southern Ry. Co.*, 239 S.W.2d 964, 966 (Ky. 1951)). Here, the Commonwealth, as guarantor of the KAPT plan, was the drafter of the Master Agreement and the enabling statutes, and so, to the extent there is ambiguity in the relevant language, it is to be construed in favor of the plan participants and against the drafter. This is particularly so given the effortless ease with which the Master Agreement could have warned plan participants that KAPT plans were not, in fact, the "locked in" prepaid tuition benefits portrayed in the promotional material.

By now adopting the position that the KAPT plan may be amended by the legislature for any reason, Appellees are, in effect, acknowledging that the Board's promise to pay the participant's future tuition was not an "irrevocable pledge and guarantee by the fund to pay for the tuition."

17

"Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156 (Ky. 1991)); *see also Hunt Enterprises, Inc. v. John Deere Indus. Equipment, Co.*, 162 F.3d 1161 (6th Cir. 1998). Changing the KAPT plan in a way that impairs the benefits of participants seeking to educate their children violates this covenant. Unlike the Court of Appeals' conclusion, our interpretation of the relevant provisions avoids this result and reflects our confidence that the legislature does not intend the statutes to be interpreted in a way that undermines the Commonwealth's "irrevocable pledge."

The interpretation endorsed by the Court of Appeals and the Appellees also results in an illusory contract. "An illusory contract may be defined as an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has not committed himself in any manner. In other words, an illusory promise is a promise that is not a promise. The promise is an illusion." *Harrington v. Harrington*, 365 N.W.2d 552, 555 (N.D. 1985) (citing Corbin, *"The Effect of Options on Consideration,"* 34 Yale L.J. 571 (1925)).

If the KAPT contract is interpreted as allowing the state to alter its obligation at the will of the legislature, as suggested by the Court of Appeals and the Appellees, the commitment made by the Commonwealth to plan participants "is not a promise . . . [t]he promise is an illusion." Quoting 7

18

Williston on Contracts, § 7:7, at 88–89 (4th ed. 1992), this Court held in *RAM Engineering & Construction, Inc. v. University of Louisville*, 127 S.W.3d 579, 586 (Ky. 2003):

> Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. Even if it were recognized by law, it would impose no obligation, since the promisor always has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promissee. *In such cases, the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration.*

(emphasis added.)

If, as Appellees assert, the state as the contracting entity has reserved unto itself unlimited discretion to alter its promise of performance for any reason, then it has made no promise that can serve as consideration. Our interpretation avoids that interpretation of the contract.

## C. Summary

In summary, we conclude that the trial court correctly interpreted the relevant statutory text and Master Agreement. The language of the contract reflects the agreement of Appellants to accept future amendments of the governing statutes only to the extent they are "necessary to assure compliance with applicable state or federal law or regulations or to preserve favorable tax treatment of the KAPT program." The changes under review here do not fit within that limited category.

Because the Court of Appeals concluded that Appellants, including Maze, by the language of the contracts, had consented to be bound to any future

legislative changes, and thus had agreed to be bound to the 2014 changes, its opinion did not need to address the Impairment Clause issue. There is no Impairment Clause concern if the parties anticipated and agreed that future legislation could alter the terms of their contract.

Because we conclude that Appellants' contracts did not bind them to future legislative amendments of their contracts, we must look further to determine whether the impairment of contract clauses in our state and federal constitutions protect them from the legislative amendments to the terms of the contracts embodied in the 2014 legislation.

## IV. THE 2014 AMENDMENTS TO KAPT VIOLATE THE FEDERAL AND STATE IMPAIRMENT OF CONTRACT CLAUSES

The trial court and the parties to this action rely heavily upon the Impairment Clause analysis set forth by the Supreme Court in *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1 (U.S. 1977). We agree that *United States Trust* sets forth the applicable analytical framework in the form of a three-stage analysis. We begin by noting the basic principles relating to Impairment Clause review.

### A. General Principles Relating to the Contract Impairment Clauses

The United States Constitution provides that "[n]o State shall . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts . . . ." U.S. Const. Art. I § 10, cl. 1. Similarly, the Kentucky Constitution states that "[n]o ex post facto law, nor any law impairing the obligation of contracts, shall be enacted." Ky. Const. § 19.

20

Despite the seemingly unequivocal language of the federal and state Contract Impairment Clauses, "[a] constitutional prohibition against impairing the obligation of contracts . . . is not an absolute one to be read with literal exactness. The Contract Clause does not prevent a state from enacting regulations or statues which are reasonably necessary to safeguard the vital interests of its people." *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotes and citation omitted). Moreover, the Clauses do not prevent parties from agreeing that their contracts will be subject to "present and future state and federal law." *Id.* at 416; *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934). Similarly, in *United States Trust*, the Supreme Court stated "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" 431 U.S. at 21-22 (citing *Blaisdell*, 290 U.S. at 434).

In *Kentucky Utilities Co. v. Carlisle Ice Co.*, 131 S.W.2d 499, 504 (Ky. 1939), our predecessor Court discussed the scope of the General Assembly's authority to retroactively impair a contract as follows:

> "Any law which changes the intention and legal effect of the original parties, giving to one greater or the other a less interest or benefit in the contract, impairs its obligation. The extent of the change is immaterial. Any deviation from its terms . . . imposing conditions not included in the contract, or dispensing with the performance of those that are included, however small and unimportant they may appear to be in their effect, impairs the obligation of a contract. . . . The Legislature may regulate the remedy and the methods of procedure under a past as well as a

21

future contract, but it cannot impose new restrictions upon the enforcement of a past contract, so as materially to lessen its value and benefit to either party." *O'Connor v. Hartford Accident & Indemnity Company*, 97 Conn. 8, 9, 115 A. 484, 486.

"A legislative act will not be permitted, even if an attempt to do so is disclosed, to operate retrospectively where it will have the effect to invalidate or impair the obligation of contracts or interfere with vested rights." *Travelers' Insurance Company v. Ohler*, 119 Neb. 121, 227 N.W. 449, 450; *Cooley Const. Lim.*, 8th Ed., 771; R.C.L. Vol. 6, p. 362; *Dunlap v. Littell*, 200 Ky. 595, 255 S.W. 280.

A comparison of *Carlisle Ice* with the federal decisions discloses that Kentucky jurisprudence takes a more restrictive view on the legislature's power to impose changes to existing contractual benefits and obligations than the pronouncements of the federal courts.

## B. *United States Trust Co. of New York* Test

In *United States Trust*, the Supreme Court used the following three-stage analysis for determining when a legislative action violated the federal impairment of contract clause: (1) whether the legislation operates as a substantial impairment of a contractual relationship; (2) if so, then the inquiry turns to whether there is a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem; and (3) if, as in this case, the government is a party to the contract, we examine "whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign powers," and we determine if the impairment is "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." As further explained below, we are

22

persuaded that the 2014 amendments put in place by HB 279 cannot pass muster under *United States Trust* analysis.

## 1. Stage One: Substantial Impairment Inquiry

The first step under *United States Trust* is determining "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U.S. at 244; *Energy Reserves Group, Inc.*, 459 U.S. at 411. In applying this analysis, the severity of the impairment guides the level of scrutiny to which the legislation will be subjected, with the level of scrutiny increasing in correlation with the severity of the impairment. *Allied Structural Steel Co.*, 438 U.S. at 245. The destruction of a party's contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.*, 431 U.S. at 26–27.

A significant consideration in this step of the analysis is the extent to which the industry subject to the contract has been regulated in the past. *Allied Structural Steel Co.*, 438 U.S. at 242, n. 13 (citing *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.")). The rationale for this rule is thusly stated: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).

23

Our examination of the 2014 amendments demonstrates that they do substantially impair the original contracts entered into by Maze. Specifically, the 2014 KAPT amendments fundamentally altered Maze's contractual right to use, for her children, her KAPT funds for graduate school, and they directly curtailed the financial value of the benefit by capping future growth so that all of the promised tuition may not be paid. These changes were imposed retroactively, significantly devaluing the benefit promised to Maze. As noted previously, when Maze purchased her three KAPT contracts, the Master Agreement and its enabling statutes did not restrict her use of the funds to a specific time period, and the agreements did not cap the fund's growth. By imposing constraints not included in the original contract, the 2014 Amendments impose upon the participant a loss of the bargained-for benefit. If the prepaid tuition is not used within the newly-prescribed time frame, the "irrevocable pledge" that the tuition will be locked-in at the tuition rate in effect at the time the plan was purchased is substantially impaired. The 2028 sunset provision interjected into the agreement by the 2014 Amendments also reduces the value of the KAPT benefit, but perhaps to a lesser degree and with a fewer number of participants affected.

Under the original Master Agreement, the student's ultimate use of KAPT's prepaid tuition was not affected by his PCEY (projected college entrance year), but the 2014 Amendments pegged the duration of the KAPT benefits to the specific time frame beginning in the PCEY. This new limit indirectly affects a participant's ability to transfer KAPT benefits among siblings or other

24

relatives, which was an important selling point at the time Maze purchased her contracts.

According to the Appellees' own statistics, the cumulative financial detriment which will befall plan participants is $20.1 million, a significant impact by any measure. We conclude that the retroactive application of the 2014 amendments substantially impairs the contracts of Maze and the other similarly situated participants by extinguishing vested rights of the purchasers to benefits promised under the terms of the agreement.

## 2. Stage Two: Justification Review

The second stage of the *United States Trust* analysis involves a determination of whether the newly-imposed conditions that impair the contract can be justified by a significant and legitimate public purpose. 431 U.S. at 22. Among the purposes that justify such impairment is legislation aimed at the remedying of a broad and general social or economic problem. *Allied Structural Steel Co.*, 438 U.S. at 247. Moreover, since *Home Building & Loan Association v. Blaisdell*, 290 U.S. 393 (1934) (Minnesota's suspension of creditor's remedies was not in violation of the U.S. Constitution), the Supreme Court has indicated that the public purpose of the contract-impairing law need not be limited to addressing an emergency or temporary situation. *United States Trust Co.*, 431 U.S. at 22, n. 19; *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. at 39–40. For example, one legitimate state interest fitting into this category is legislation eliminating unforeseen windfall profits. *United States Trust Co.*, 431 U.S. at 31, n. 30. The requirement of a legitimate public

25

purpose is justified because it guarantees that the State is exercising its police power, rather than providing a benefit to special interests. *Energy Reserves Group, Inc.*, 459 U.S. at 412; *Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 267 (E.D. Ky. 1995).

The Appellees argue that the amendments have the significant and legitimate public purpose of protecting the Commonwealth's treasury and assuring that the Commonwealth will be able to meet its obligations to KAPT account holders. They describe the amendments as an economic necessity brought about by dramatic increases in tuition at state universities in the years immediately following the beginning of the KAPT program. As a result of these unforeseen tuition increases, a significant unfunded liability, as much as $52.9 million, was created. Appellees note that the 2014 KAPT amendments would reduce the Commonwealth's unfunded KAPT liability by $20.1 million. Appellees also note the harmful effect upon the KAPT fund caused by KAPT accounts being held, rather than used for educational purposes.[5]

As noted by the trial court, reducing a large unfunded liability is an admirable objective, but it is not reasonable that the General Assembly would

---

[5] In effect, participants could potentially abuse the plan by holding onto the account instead of using the money as tuitions rise, to attain what amounts to a risk-free rate of return indexed to rising tuition costs. There is no allegation that Maze has done so, or that she has acted with anything but the utmost good faith. This decision does not extend to such circumstances. Plan participants have a duty of good faith and fair dealing in utilizing their KAPT contracts, and those that exploit the contracts to achieve risk-free high rates of return with no intention of using the funds for educational purpose are in violation of the contract. Our holding here does not foreclose the possibility of redress against such abuse.

pursue that goal by impairing or devaluing the state's existing contractual obligations, created precisely in anticipation of rising tuition costs. The KAPT program was inspired and created by the legislature to protect participants from the rising costs of college tuition. Parents, like Maze and others, were induced to sign KAPT agreements because KAPT promotional material told them that college tuition was rising, and therefore, paying at today's lower prices guarded against future increases. The fact that the KAPT program's costs of performing its contractual obligations exceeded its own expectations does not justify altering the obligations so they more closely conform to its faulty expectations.

In *Unites States Trust*, the Supreme Court disapproved of the legislative impairment of contracts when the purported legitimate purpose related to government spending or saving, noting the states' self-interest as a concern. *See United States Trust Co.*, 431 U.S. at 26-27; *see also Lynch v. United States*, 292 U.S. 571, 580 (1934) (the impairment of a state's desire to limit public spending does not justify the impairment of a state's contractual obligations despite the presence of a legitimate public purpose). The only purpose of HB 279 and the 2014 KAPT amendments was to reduce the state's liability by abandoning a portion of its contractual obligation, which were described to the contracting parties as an "irrevocable pledge and guarantee" to cover the cost of future rises in tuition. We are persuaded that the Appellees have failed to proffer a significant and legitimate public purpose behind the law.

27

In summary, we are persuaded that the 2014 amendments do not address a broad and general social or economic problem as contemplated under *United States Trust, Allied Structural Steel Co.*, and *Blaisdell.* We accordingly hold that the 2014 amendments cannot be sustained under step two of the *United States Trust* test.

### 3. Stage Three: Unforeseen or Unintended Effects

The third stage of the *United States Trust* analysis examines whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States Trust Co.*, 431 U.S. at 22. Analysis under this prong varies depending upon whether the State is a party to the contract. When the State itself is not a contracting party, "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 22–23; *Energy Reserves Group, Inc.*, 459 U.S. at 410–13.

However, when a state, operating through a state agency, enters into a contract, the general rule is that it cannot simply walk away from its financial obligation by absolving itself through unilateral amendments to the contract. When the State is a party to the contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co.*, 431 U.S. at 26. In almost every case where this situation has arisen, the Supreme Court has held

28

that the governmental unit was bound to its contractual obligations. *See United States Trust Co.*, 431 U.S. at 25–28; *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935); *Murray v. Charleston*, 96 U.S. 432 (1878); *Energy Reserves Group, Inc.*, 459 U.S. at 410–13, 14; *see also A Process-Oriented Approach to the Contract Clause*, 89 Yale L.J. 1623, 1647–1648 (1980) (distinguishing public from private contracts); *cf. Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942).

Because the Commonwealth is a party to the contract in this case, the stricter standard applies in our evaluation of the reasonableness and necessity of the 2014 amendments. Because the state's self-interest is involved, we do not accord the "complete deference to a legislative assessment of reasonableness and necessity" that would otherwise apply to legislation that impinges upon the obligations of purely private-party contracts. *United States Trust Co.*, 431 U.S. at 26.

When the state is a party to the contract impaired by the state's legislation, the reasonableness of the impairment is judged on whether the existing contractual obligations of the state "had effects that were unforeseen and unintended by the legislature" at the time the contract creating those obligations were created. *Md. State Teachers Ass'n v. Hughes*, 594 F. Supp. 1353, 1362 (D. Md. 1984) (citing *United States Trust Co.*, 431 U.S. at 31). With respect to the necessity of a state's contractual impairment, necessity is to be considered on two levels: first, "whether a less drastic modification could have

29

been implemented" and second, "whether the state could have achieved its goals without modification." *Hughes,* 549 F. Supp. at 1362.

Appellees argue that the 2014 Amendments were reasonable and appropriate in light of dramatically inflating tuition costs at state universities, something they claim was unforeseeable when the KAPT program was created. Appellants counter that the unanticipated underfunding problem occurred because the KAPT fund was inadequately managed.

Upon application of the two-part *Hughes* analysis, we conclude that the 2014 Amendments cannot be sustained under the third stage of the *United States Trust* test. Citing *City of El Paso v. Simmons,* 379 U.S. 497, 509 (1965), *Hughes* noted that a state may not "adopt as its policy the repudiation of debts or the destruction of contracts or denial of the means to enforce them." Upon review, we are persuaded that the Appellees have failed to proffer evidence that the KAPT agreements executed prior to the 2014 KAPT amendments reasonably resulted in effects that were unforeseen and unintended by the legislature.

As previously noted, the fundamental purpose of the KAPT program was to protect against tuition inflation at state universities, and so, it is self-contradictory to now claim that tuition inflation was unforeseen at the time of the creation of the program. Indeed, the program was operating precisely as foreseen in permitting its participants to lock-in lower tuition rates as of the time they entered into the program. And while unexpectedly high tuition increases resulted in a $52 million underfunding (perhaps exacerbated by a deficient investment strategy of KAPT managers), these "unforeseen" events are

not such that the General Assembly may self-servingly renounce its debts and impair $20.1 million dollars in benefits owed to the plan participants pursuant to the agreements. We also note that the legislature was not totally powerless with respect to control over the cost of tuition at state universities.

Similarly, a state is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well. *United States Trust Co.*, 431 U.S. at 32. While it is likely true that the Commonwealth could not have achieved the same level of savings, $20.1 million dollars, without modification of the KAPT agreements, there are, in fact, other less drastic modifications which could have been made, as were noted by the trial court.

It follows that the 2014 KAPT amendments are neither reasonable nor necessary, and the state may not escape an unfavorable contract with retroactive legislation that substantially impairs the state's contractual obligations. This result is prohibited by the respective Contract Clauses of the United States and Kentucky Constitutions.

## V. CONCLUSION

For the reasons stated above we conclude that the KAPT contracts executed by Maze and those similarly situated, and the underlying enabling statutes, do not provide for retroactive amendments such as those at issue here. We further conclude that the enactment of those retroactive amendments unlawfully impaired those contracts in violation of U.S. Const. Art. I § 10, cl. 1. and Ky. Const. § 19. We, accordingly, reverse the Court of

31

Appeals and reinstate the partial summary judgment awarded to Maze by the Franklin Circuit Court.

Minton, C.J.; Hughes, Keller, VanMeter, and Wright, JJ., concur. Cunningham, J., not sitting.

COUNSEL FOR APPELLANTS:

Robert Andrew Rowland

COUNSEL FOR APPELLEES:

Laura Tipton
Taylor Allen Payne
Assistant Attorneys General