**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1764**

───────────────

BRIAN BOWEN, II,

Plaintiff – Appellant,

v.

ADIDAS AMERICA INC; JAMES GATTO; CHRISTIAN DAWKINS; MUNISH SOOD; THOMAS GASSNOLA; CHRISTOPHER RIVERS,

Defendants – Appellees.

───────────────

**No. 21-2029**

───────────────

BRIAN BOWEN, II,

Plaintiff – Appellant,

v.

ADIDAS AMERICA INC.; JAMES GATTO; CHRISTIAN DAWKINS; MUNISH SOOD; THOMAS GASSNOLA; CHRISTOPHER RIVERS,

Defendants – Appellees.

───────────────

Appeals from the United States District Court for the District of South Carolina, at Columbia.  Joseph F. Anderson, Jr., Senior District Judge.  (3:18-cv-03118-JFA)

───────────────

Argued:  September 16, 2022                    Decided:  October 12, 2023

───────────────

Before KING, RUSHING, and HEYTENS, Circuit Judges.

_____

Affirmed by published opinion. Judge Rushing wrote the majority opinion, in which Judge Heytens joined. Judge King wrote a dissenting opinion.

_____

**ARGUED:** William Walter Wilkins, NEXSEN PRUET, LLC, Greenville, South Carolina, for Appellant. William H. Taft, V, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellees. **ON BRIEF:** W. Mullins McLeod, Jr., Colin V. Ram, MCLEOD LAW GROUP LLC, Charleston, South Carolina, for Appellant. Matthew T. Richardson, Mary Lucille Dinkins, WYCHE, Columbia, South Carolina; Andrew M. Levine, Nathan S. Richards, Matthew D. Forbes, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellee adidas America, Inc. Cory E. Manning, Columbia, South Carolina, Robert L. Lindholm, Charlotte, North Carolina, Wesley T. Moran, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Myrtle Beach, South Carolina, for Appellee Christopher Rivers. Terry A. Finger, FINGER, MELNICK, BROOKS & LABRUCE, Hilton Head Island, South Carolina, for Appellee Christian Dawkins. Deborah B. Barbier, DEBORAH B. BARBIER, LLP, Columbia, South Carolina, for Appellee James Gatto. Richard J. Zack, Thomas H. Cordova, TROUTMAN PEPPER HAMILTON SANDERS LLP, Philadelphia, Pennsylvania; Wilbur E. Johnson, CLEMENT RIVERS, LLP, Charleston, South Carolina, for Appellee Munish Sood.

_____

RUSHING, Circuit Judge:

In 2017, Brian Bowen II was a promising high-school basketball player who aspired to play professionally. At the end of high school, Bowen committed to play NCAA Division I basketball for the University of Louisville (Louisville) in exchange for a full, four-year scholarship. Bowen hoped that by playing Division I basketball, he could become a top NBA prospect. Those hopes were dashed when a college basketball bribery scheme unraveled, exposing that Bowen's father, Brian Bowen Sr., accepted a bribe in connection with Bowen's decision to play for Louisville. As a consequence, Bowen lost his NCAA eligibility, and Louisville cut him from the team. Bowen sued the central figures in the bribery scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, to recover treble damages, including lost future professional earnings and the attorney's fees and costs he incurred trying to restore his NCAA eligibility. The district court granted summary judgment to the defendants, concluding that Bowen did not demonstrate an injury to his business or property, as required for a private civil RICO claim. The district court later denied Bowen's motion for reconsideration. Bowen appeals both rulings, and we affirm.

I.

A.

In high school, Bowen was an exceptional basketball player. As a McDonald's All-American and five-star recruit, Bowen was a sought-after prospect for many NCAA Division I schools. At one point, ESPN ranked Bowen thirteenth overall in the 2017 class. Bowen Sr. and an aspiring sports agent, Christopher Dawkins, helped Bowen during the

3

recruitment process and accompanied him on university visits. Dawkins hoped that by helping Bowen get to the NCAA, he could later represent Bowen in the NBA. One of the schools recruiting Bowen was Louisville. As an assistant coach told Bowen in a text message, Louisville wanted him to have "immediate playing time" and be a "featured scorer" on the team. J.A. 1702.

Bowen committed to play basketball for Louisville and signed a scholarship agreement to that effect in June 2017. Under the agreement, Louisville awarded Bowen a full, four-year scholarship covering tuition, fees, books, housing, meals, and miscellaneous expenses in exchange for Bowen's commitment to play on the men's basketball team. By signing the agreement, Bowen certified he understood the agreement could "be immediately reduced or canceled at any time if" he became ineligible to compete or voluntarily withdrew from the team. J.A. 292. The scholarship agreement also promised that Bowen's scholarship would "not be reduced, canceled, or non-renewed at any time" because of his "athletics' ability, performance, condition, or contribution [to] the team's success," or "for any other athletics reason." J.A. 292.

To play NCAA Division I basketball, Bowen had to comply with the NCAA's eligibility rules, including its amateurism rules. *See* NCAA Bylaws § 12.01.1 (2016) ("Only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport."). Under the amateurism rules, "student-athletes -- and their families -- may not accept payments of any form for the student-athletes' playing or agreeing to play their sport," subject to certain exceptions. *United States v. Gatto*, 986 F.3d 104, 111 (2d Cir. 2021). Shortly after committing to play for Louisville, Bowen affirmed that, "to the

4

best of [his] knowledge, [he had] not violated any amateurism rules." J.A. 297.  The NCAA

Eligibility Center certified Bowen's eligibility to play, and his eligibility remained intact

through August and early September 2017 as Bowen began practicing with the team.

But before Bowen could play his first college game, his plans were derailed.  In

September 2017, federal prosecutors unveiled a criminal complaint against Dawkins,

James Gatto, Merl Code, and Munish Sood.  The complaint charged that these defendants

(and one other) facilitated bribes to student-athletes or their family members to entice the

athletes to play basketball at Division I schools sponsored by apparel company Adidas

America, Inc.  Prosecutors separately charged Thomas Gassnola for his role in the scheme.

Gatto was Adidas's director of global sports marketing for basketball.  He "managed

the sports marketing budget," and his responsibilities included "ensur[ing] the success of

the sponsorship agreements Adidas had signed with" universities like Louisville.  *Gatto*,

986 F.3d at 111.  Gassnola and Code were both Adidas consultants.  *See id.*  Sood was a

financial advisor.  Gatto, Gassnola, and Code colluded with Sood and Dawkins to pay "the

families of top-tier high school basketball recruits" to persuade the players to enroll at

Adidas-sponsored universities.  *Id.*  Their goal was to "lur[e] the best basketball players to

Adidas-sponsored schools to better market [the Adidas] brand."  *Id.* at 116.

The criminal complaint accurately charged that Bowen's decision to play for

Louisville was tainted by one such bribe.  Around the same time Bowen committed to play

for Louisville, Bowen Sr. agreed to accept $100,000 from Adidas, which Dawkins

facilitated.  *See id.* at 112.  On July 13, 2017, Sood delivered the first payment—$19,400

in cash—to Bowen Sr.  The FBI arrested Gatto, Dawkins, and Code before they made any

5

additional payments.  *See id.*  Evidence suggests Bowen was ignorant of his father's misdeeds.  Nevertheless, Bowen Sr.'s decision to accept the bribe and his receipt of the first installment violated NCAA rules and undermined Bowen's eligibility to play NCAA basketball.  *See* NCAA Bylaws §§ 13.01.1, 16.01.1, 16.02.3, 16.02.4 (2016).

When the criminal investigation became public, Louisville withdrew Bowen from the men's basketball team.  Louisville declined to officially declare Bowen ineligible and then seek his reinstatement with the NCAA.  In a letter, the interim athletics director explained that Bowen would "not be allowed to practice with or compete for [the] men's basketball team at any point in the future."  J.A. 751.  However, Louisville allowed Bowen to "continue to receive [his] athletics scholarship" if he chose to remain enrolled.  J.A. 751.

Bowen did not stay at Louisville.  Instead, he voluntarily withdrew after his first semester and transferred to the University of South Carolina, where he began practicing with the basketball team.  The University of South Carolina declared Bowen ineligible and petitioned the NCAA to reinstate his eligibility, but to no avail.  Bowen and his family incurred nearly $30,000 in legal fees for their failed effort to restore his eligibility.  After twice declaring for the NBA draft, briefly playing professionally in Australia, and playing several seasons on NBA two-way contracts, Bowen's professional basketball career has not taken off as he had hoped.

6

B.

In August 2019, Bowen filed an amended complaint in the District of South Carolina against Adidas America, Inc., Gatto, Code,[1] Dawkins, Sood, Gassnola, and Christopher Rivers,[2] alleging two substantive RICO violations, *see* 18 U.S.C. § 1962(a), (c), and two RICO conspiracies, *see id.* § 1962(d). The defendants moved to dismiss. They argued, in part, that Bowen had not alleged a cognizable injury to his business or property as necessary to pursue a private civil RICO claim under 18 U.S.C. § 1964(c), and that even if he had, he had not plausibly alleged that the defendants proximately caused his injuries. The district court granted the motion in part; however, the court determined that Bowen "alleged sufficient facts concerning causation and injury required for RICO to enable him to proceed beyond the pleading stage of this case." *Bowen v. Adidas America, Inc.*, No. 3:18-3118-JFA, 2020 WL 13076108, at *11 (D.S.C. Feb. 27, 2020).

After discovery, the defendants moved for summary judgment, again arguing Bowen had not demonstrated that they proximately caused a cognizable injury to his business or property under Section 1964(c). This time, the district court agreed and granted summary judgment in the defendants' favor. *Bowen v. Adidas America, Inc.*, 541 F. Supp. 3d 670 (D.S.C. 2021). The court later denied Bowen's motion for reconsideration. *Bowen v. Adidas America, Inc.*, No. 3:18-3118-JFA, 2021 WL 3711131 (D.S.C. Aug. 20, 2021).

---

[1] Code is not a party on appeal.

[2] Rivers was an Adidas employee who Bowen alleges was part of the bribery scheme and knew about the efforts to influence Bowen to attend Louisville. Rivers was not criminally prosecuted.

7

II.

A.

We review de novo a district court's decision to grant summary judgment, applying the same legal standards as that court. *See Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). Viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ballengee*, 968 F.3d at 349. "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). If the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

B.

Congress made the civil RICO cause of action for treble damages available only to plaintiffs "injured in [their] business or property" by a defendant's RICO violation. 18 U.S.C. § 1964(c); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495–497 (1985); *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 264 (4th Cir. 2001).[3]

---

[3] Section 1964(c)'s injury and proximate cause requirements are sometimes called "standing" requirements. *See, e.g., Potomac Elec. Power Co.*, 262 F.3d at 264. Despite that label, those statutory requirements do not implicate a court's subject-matter

8

Without an injury to "his business or property," even a plaintiff who can prove he suffered some injury as a result of a RICO violation lacks a cause of action under this statute. 18 U.S.C. § 1964(c).

The "word 'property' has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) (interpreting "business or property" in Section 4 of the Clayton Act and citing Webster's Third New Int'l Dictionary (1961)); *see Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267 (1992) ("Congress modeled § 1964(c) on . . . § 4 of the Clayton Act"). The word "business" in this context connotes "a commercial or industrial enterprise" or "commercial or mercantile activity customarily engaged in as a means of livelihood." Webster's Third New Int'l Dictionary 302 (1971). Although a plaintiff's "business" and his "property" may overlap, Section 1964(c) covers two distinct types of injury. *See Reiter*, 442 U.S. at 338–339.

The phrase "business or property" does not, however, encompass all possible injuries. It excludes, for example, personal injuries and "pecuniary losses occurring therefrom." *Bast v. Cohen, Dunn, & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995); *see Reiter*, 442 U.S. at 339. Courts have also held that injuries "to mere expectancy interests" do not suffice. *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 345 (5th Cir. 2021) (internal

jurisdiction because they do not concern a court's power to adjudicate a civil RICO case. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Instead, injury to business or property and proximate causation are elements a plaintiff must prove to avail himself of RICO's private cause of action. *See CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52–53 (4th Cir. 2011) (discussing "statutory standing" generally).

9

quotation marks omitted); *see Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728–729 (8th Cir. 2004).

Bowen contends the defendants caused him to suffer three cognizable business or property injuries: (1) loss of benefits secured by his scholarship agreement with Louisville; (2) loss of his NCAA eligibility; and (3) loss of money spent on attorney's fees attempting to regain his eligibility.  We consider each argument in turn.

1.

Bowen first claims a business or property interest "in the contractual benefits he secured from [Louisville] through his" scholarship agreement.  Opening Br. 28.  According to Bowen, that agreement obligated Louisville to provide him with certain basketball-related benefits—including "elite coaching, preferred playing positions on the court, athletic training, strength and nutrition services, competitive playing time, and experience reading game film," Opening Br. 29—that he lost because the defendants' conduct disqualified him from playing on the team.

We may grant that Bowen had a business or property interest in the contractual benefits of his scholarship agreement with Louisville.  *See O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015) (concluding the "transaction" between a student-athlete and a university offering a scholarship is commercial because "both parties to that exchange anticipate economic gain from it"); *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) (concluding RICO plaintiff alleged harm to a property interest because his allegations amounted to tortious interference with a contract under state law).  But Bowen has not demonstrated an injury to that interest because the benefits he lost were not

10

promised in the scholarship agreement.  To the contrary, Bowen received everything to which his scholarship entitled him.

As the parties agree, to determine whether Bowen has shown an injury under this theory, we must interpret Bowen's scholarship agreement according to Kentucky contract law.  Under Kentucky law, "in the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (internal quotation marks omitted).  If a contract is unambiguous, a court "look[s] only as far as the four corners of the document to determine the parties' intentions." *Id.* (internal quotation marks omitted).  By contrast, "'[w]here a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties.'" *In re Conco, Inc.*, 855 F.3d 703, 711 (6th Cir. 2017) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)).

The agreement between Bowen and Louisville was entitled "Athletics Financial Aid Agreement for Student-Athletes." J.A. 291.  It listed Bowen's sport as "Men's Basketball." J.A. 291.  In exchange for committing to play basketball, the agreement promised Bowen the maximum compensation then allowed under NCAA rules:  a full, four-year scholarship covering tuition and fees, books, room and board, and miscellaneous expenses. *See* Oral Arg. at 02:00–02:22 (Bowen's counsel acknowledging Bowen received the maximum

11

compensation allowed under NCAA rules).  Nowhere did the agreement promise athletic training or services, elite coaching, preferred positions, or playing time.

Bowen did not suffer any injury under the scholarship agreement's unambiguous terms.  After federal prosecutors exposed the defendants' bribery scheme, Louisville allowed Bowen to keep his scholarship, even though it withdrew him from the team. Louisville continued to give Bowen exactly what the agreement promised.  Bowen relinquished the scholarship when he transferred to the University of South Carolina, and he cannot now sue under RICO to recover benefits he voluntarily surrendered.

Resisting this conclusion, Bowen argues that although "the agreement is silent as to the basketball related benefits promised," we should "'imply an obligation to carry out the purpose for which the contract was made,'" which he claims was "the provision of basketball career development to [Bowen] in exchange for his commitment to play for [Louisville]."  Opening Br. 34 (quoting *In re Conco*, 855 F.3d at 712).  In support, Bowen cites parol evidence, such as the text message an assistant coach sent him during recruiting saying Louisville wanted Bowen to get "immediate playing time" and be a "featured scorer" for the team.  J.A. 1702.

But unlike *In re Conco*, on which Bowen relies, the agreement here is not "silent or ambiguous" as to what Louisville promised Bowen in exchange for his commitment to play basketball for the school.  855 F.3d at 712.  Indeed, Bowen's articulation of the "obvious purpose" of the agreement contradicts the agreement's terms.  Reply Br. 7.  Louisville did not promise Bowen career development and immediate playing time in exchange for his commitment to play for the school.  Rather, the agreement unambiguously promised

12

Bowen the full cost of tuition and fees, room and board, books, and miscellaneous expenses in exchange for his commitment. Because the scholarship agreement is unambiguous on this point, we must construe it according to its terms and "without resort to extrinsic evidence." *Maze*, 559 S.W.3d at 363 (internal quotation marks omitted).

Bowen emphasizes that the scholarship agreement required him to offer his athletic labor to the school. But that obligation on Bowen did not impose a reciprocal obligation on Louisville to use his labor or provide him with certain athletic benefits to improve his skills. *See*, *e.g.*, *Giuliani v. Duke Univ.*, No. 1:08CV502, 2010 WL 1292321, at *6 (M.D.N.C. Mar. 30, 2010) ("[E]ven contractual athletic scholarships do not ensure a student's right to play a sport but only constitute a promise by the university to provide the student with financial assistance in exchange for the student's maintenance of athletic eligibility."); *Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (holding an unambiguous scholarship agreement that was silent on "the right to play basketball" did not implicitly contain such a right).

We don't doubt that, as Bowen contends, the best college basketball recruits choose among the schools vying for their labor based on a comparison of coaching staff, predicted playing time, anticipated training, and the like, rather than by comparing financial aid packages. None of those enticements, however, are guaranteed in the written agreement. If Bowen didn't receive immediate playing time, or if Coach Pitino left the school, Bowen would have had no breach of contract claim based on this scholarship agreement. Although the prospect of those benefits motivated Bowen to agree to play basketball at Louisville, those additional benefits are not listed in the agreement. And, under Kentucky law, "[t]he

13

fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Maze*, 559 S.W.3d at 363 (internal quotation marks omitted).

Because the scholarship agreement is unambiguous, we decline to consider parol evidence to interpret it. And because Louisville allowed Bowen to keep his scholarship even after withdrawing him from the team, he did not suffer an injury to his business or property interest in the agreement. Accordingly, the district court correctly concluded that Bowen has not demonstrated he suffered a cognizable injury under his scholarship agreement with Louisville.

2.

Next, Bowen contends that the loss of his NCAA eligibility was a cognizable business or property injury for purposes of Section 1964(c). We disagree.

We may easily dispose of the argument that Bowen had a property interest in his NCAA eligibility. A student-athlete's eligibility is a status, not a thing "of material value" the athlete "own[s] or possess[es]." *Reiter*, 442 U.S. at 338. For example, there is no indication Bowen could sell, lease, or otherwise transfer his eligibility to another person. *See Property*, Webster's Third New Int'l Dictionary 1818 (1971) (defining "property" as "something that is or may be owned or possessed" and "the exclusive right to possess, enjoy, and dispose of a thing"); *cf. United States v. Adler*, 186 F.3d 574, 577 (4th Cir. 1999) (interpreting the word "property" in the wire fraud statute according to "the common sense notion that property is anything in which one has a right that could be assigned, traded,

14

bought, and otherwise disposed of" (internal quotation marks omitted)). Although eligibility may be valuable to the individual student-athlete, it is not property.

Moreover, being eligible to play Division I college basketball did not confer on Bowen a right—much less a property right—to do so. Rather, Bowen's eligibility gave him only the opportunity to play college basketball. And we have previously concluded, consistent with the decisions of other courts, that student-athletes do not have "a property interest in intercollegiate athletic participation." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011) (emphasis omitted).[4] Bowen does not identify any courts that have held to the contrary.

As for whether loss of his NCAA eligibility injured Bowen "in his business," 18 U.S.C. § 1964(c), his claim is a moving target. To the extent Bowen claims he was in the business of playing college basketball, he suffered no cognizable injury because, despite losing his eligibility, he continued to receive the maximum compensation allowed at that time to a student-athlete: a full scholarship. If he had retained his eligibility and continued

---

[4] Our ruling in *Equity in Athletics* came in the context of resolving a due process claim. Bowen would have us disregard that decision and others like it because RICO does not require a plaintiff to show a *constitutionally* protected property interest. But the property interests protected by the Fourteenth Amendment must "stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In *Equity in Athletics*, for example, we agreed with the district court's conclusion that state law did not recognize a property interest in intercollegiate athletic participation. *See* 639 F.3d at 109; *Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 680–681 (W.D. Va. 2009). Courts have similarly consulted state law when assessing claimed property interests for purposes of Section 1964(c), and we think a limited recourse to decisions assessing state property law for guidance is not inappropriate here. *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565 (6th Cir. 2013) (en banc); *DeMauro v. DeMauro*, 115 F.3d 94, 96–97 (1st Cir. 1997).

15

playing, Bowen could not have received any greater compensation than that for playing college basketball. And his voluntary surrender of the full scholarship does not create an injury.

In support of this version of his claim, Bowen relies heavily on the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021). There, a group of student-athletes filed an antitrust action challenging the "NCAA rules that limit the compensation they may receive in exchange for their athletic services." 141 S. Ct. at 2151 (internal quotation marks omitted). The district court enjoined certain NCAA rules that limited the education-related benefits schools could offer student-athletes but left undisturbed rules limiting athletic scholarships and compensation related to athletic performance. *See id.* at 2147. The Supreme Court affirmed. *See id.* at 2166. In doing so, the Court acknowledged that "the NCAA's Division I essentially *is* the relevant market for elite college football and basketball" and "student-athletes have nowhere else to sell their labor." *Id.* at 2152, 2156 (internal quotation marks omitted). According to Bowen, because the Supreme Court never questioned whether the *Alston* plaintiffs had suffered a business or property injury, which is a prerequisite to maintaining an antitrust action, the Court implicitly recognized that "the labor and skill provided by NCAA athletes" is a business or property interest. Opening Br. 26.

Even so, none of this helps Bowen. In *Alston*, the student-athletes (whose eligibility was not in question) claimed NCAA rules unlawfully limited the compensation they could receive for their labor. *See* 141 S. Ct. at 2147, 2152. Lost compensation is a concrete injury to business or property. *See Reiter*, 442 U.S. at 338 ("Money, of course, is a form

16

of property."). Bowen, however, does not assert the loss of compensation for services rendered playing NCAA basketball—after all, he continued to receive the maximum compensation allowed and does not challenge the NCAA compensation limits that applied to him. Rather, he asserts the loss of his eligibility to participate in the NCAA labor market, untethered to any concrete interest like compensation.

Much of Bowen's argument, however, reaches beyond the business of college athletics. His main theory is that losing his NCAA eligibility prevented him from playing college basketball, thereby improving his basketball skills, and increasing his prospects of being selected in the NBA draft. This is not the sort of tangible business loss that supports a RICO cause of action. Bowen did not have an existing or prospective business relationship with any NBA team. Bowen emphasizes his expectation, shared by an NBA scout, that if he had retained his eligibility and played two years for Louisville, he would have been drafted by an NBA team and enjoyed a profitable professional basketball career. But injury to a "mere expectancy" or the loss of an opportunity is insufficient for a civil RICO cause of action. *HCB Fin. Corp.*, 8 F.4th at 345 (internal quotation marks omitted); *see*, *e.g.*, *id.* at 344–345 (lost investment opportunity); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 522–523 (5th Cir. 1995) (lost opportunity to obtain a loan); *Taylor v. Bettis*, 976 F. Supp. 2d 721, 737–738 (E.D.N.C. 2013) (delayed or hindered realization of expected damages recovery in other litigation), *aff'd*, 693 Fed. App. 190 (4th Cir. 2017) (per curiam); *Strates Shows, Inc. v. Amusements of Am., Inc.*, 379 F. Supp. 2d 817, 826–828 (E.D.N.C. 2005) (not being awarded an expected contract or lease that was "highly certain" based on past awards). The problem is not that Bowen lacks evidence

17

demonstrating his expectancy or fails to articulate the damages flowing from his claimed injury. Rather, the problem "is the nature of th[e] loss." *HCB Fin. Corp.*, 8 F.4th at 345 (internal quotation marks omitted). Harm to Bowen's anticipated future professional basketball career due to the loss of his NCAA eligibility and consequent opportunity to improve his skills while playing college basketball is not an "injur[y] in his business or property" cognizable under Section 1964(c).

Accordingly, we affirm the district court's determination that Bowen's lost NCAA eligibility cannot support his RICO action against the defendants.

### 3.

Finally, Bowen contends that the nearly $30,000 in attorney's fees and costs he and his family incurred trying to restore his NCAA eligibility is an injury sufficient to maintain a RICO cause of action. Certainly, lost money is a concrete injury to business or property. *See Reiter*, 442 U.S. at 338. But pecuniary losses flowing from a non-cognizable injury do not satisfy Section 1964(c)'s requirement. *See*, *e.g.*, *Bast*, 59 F.3d at 495; *Jackson*, 731 F.3d at 564–565 & n.4; *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 Fed. App. 390, 394 (4th Cir. 2012) (per curiam). Because Bowen's lost NCAA eligibility is not an injury to a business or property interest under Section 1964(c), the legal fees and expenses he incurred attempting to restore his eligibility are similarly not cognizable.

### III.

Bowen also appeals the district court's denial of his motion for reconsideration, which we review for abuse of discretion. *See United States ex rel. Carter v. Halliburton Co.*, 866 F.3d 199, 206 (4th Cir. 2017). Where, as here, "the district court's initial decision

18

was correct, the denial of a motion to reconsider cannot be clearly erroneous or manifestly unjust." *Wojcicki v. SCANA/SCE&G*, 947 F.3d 240, 246 (4th Cir. 2020).  Accordingly, we affirm the district court's denial of Bowen's motion for reconsideration.

IV.

We have no doubt that Bowen Sr.'s decision to accept a bribe, and the defendants' corrupt decision to offer one, upended Bowen's basketball career and dramatically altered his life.  But RICO is not the avenue through which Bowen may seek relief.  Thus, for the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

KING, Circuit Judge, dissenting:

The main issue we must resolve today is whether plaintiff Brian Bowen, II — a former McDonald's All-American high school basketball player who lost his NCAA eligibility when his father was bribed by defendant Adidas America Inc. and its associates — satisfies the statutory injury requirement for his claims against Adidas and the other defendants under the civil provisions of the RICO Act. On the premise that Brian cannot satisfy RICO's injury requirement, the district court and the panel majority have deemed the defendants to be entitled to summary judgment. As explained further herein, however, I would rule that Brian's loss of NCAA eligibility constitutes an injury under RICO. I would therefore vacate the summary judgment award and remand for further proceedings. As such, I respectfully dissent from the decision of my friends in the majority.

I.

I will begin by summarizing the facts pertinent to Brian Bowen, II's civil RICO claims. And I do so in the light most favorable to Brian. *See Aleman v. City of Charlotte*, 80 F.4th 264, 270 n.1 (4th Cir. 2023) ("Of course, pursuant to the applicable summary judgment standard, we must view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.").

A.

For at least a couple of years before and during 2017, Brian — at 6'7" or 6'8" — was an exceptionally talented young basketball player in Michigan and Indiana. Brian's athletic skills were widely noticed, and he collected an impressive array of accolades,

20

including being a McDonald's All-American high school player and a 5-star (on a 1 to 5 scale) college recruit. What's more, it was universally forecast that Brian would be selected in the first round of the NBA draft, just as soon as he became eligible. Brian was a good student as well, and he received more than 25 scholarship offers from major NCAA Division I basketball programs.

By his senior year of high school, Brian had narrowed his college basketball options to about a dozen major Division I programs. After nearly opting to attend the University of Oregon, Brian decided, in late May 2017, to devote his basketball skills to the University of Louisville ("UofL").

1.

Unbeknownst to Brian, defendant Adidas and several of its employees and advisors, including defendants James Gatto, Christian Dawkins, Munish Sood, Thomas Gassnola, Christopher Rivers, and Merl Code (collectively the "Adidas Schemers"), were involved in an ongoing fraud and bribery scheme involving NCAA college basketball.[1] The primary goal of that scheme was to target elite young talent in the basketball world and have the best high school athletes commit to NCAA university programs that were sponsored by Adidas. At those universities, Adidas athletic shoes and apparel were — by virtue of contractual arrangements — the mandated gold standard.

An impetus for the fraud and bribery scheme was that Adidas had fallen behind its major competitors, particularly Nike and Under Armour, in the multibillion-dollar athletic

---

[1] Although Code was initially named as an appellee herein, Brian later voluntarily dismissed Code from this appeal.

shoe and apparel market. To remedy its poor performance in that market, Adidas was seeking to increase its brand loyalty in the United States through athlete and celebrity endorsements.

By successfully placing the most outstanding young basketball players at Adidas-sponsored NCAA universities — which included, inter alia, UofL, Kansas, and North Carolina State — Adidas would secure and utilize the contractual right to display the Adidas logo by way of those athletes during their college basketball careers. Adidas would also gain a valuable opportunity to ingratiate its brand with the basketball players themselves, thereby affording Adidas the likelihood of obtaining additional sponsorships if the players later moved on to the NBA.

The Adidas Schemers primarily targeted the parents and guardians of talented young African American athletes — largely from poor backgrounds — and used an array of unlawful means to secure their attendance at Adidas-sponsored NCAA universities. With an utter lack of tact, the Schemers described their secret strategy as the "Soul Patrol" and the "Black Ops."

In executing the fraud and bribery scheme, the Adidas Schemers travelled extensively to meet with the targeted players and their families. The Schemers would then sometimes secretly offer and make monetary payments to the players' family members. In order for those payments to be covertly made, the Schemers would sometimes disguise Adidas funds by passing them through youth basketball teams in the Amateur Athletic Union ("AAU").

22

2.

Adidas and its associates were aware by 2015 of Brian's stellar prospects as a basketball player. And Brian was identified by early 2017 as one of the top uncommitted high school players that Adidas sought to have enroll at one of its sponsored NCAA universities. Brian was then considering playing basketball at several non-Adidas-sponsored schools, however, including the University of Oregon, which was sponsored by Nike. When the Adidas Schemers learned that Brian might not commit to an Adidas-sponsored university, they scrambled to arrange otherwise. Their efforts included a plan to funnel a $100,000 payment to Brian's father to secure Brian's commitment to UofL, which was then under contract as Adidas's business partner in a major sponsorship agreement worth approximately $160 million over a 10-year period. The Schemers communicated to Brian's father a promise to make the bribe payment, without specifying the amount.

On June 1, 2017, when he was 18 years of age, Brian committed to UofL and signed an "Athletics Financial Aid Agreement for Student Athletes" (the "UofL Agreement"). *See* J.A. 291.[2] Pursuant to the UofL Agreement, Brian expected to exchange his athletic labor for, among other things, the best possible coaching and playing experience, plus a scholarship covering tuition and other costs for four years. To play college basketball, Brian was obliged to comply with the NCAA's eligibility requirements. In fact, Brian had been certified by the NCAA as an eligible amateur before he committed to UofL, and he

---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

23

confirmed in the UofL Agreement that, "to the best of [his] knowledge, [he had] not violated any amateurism rules." *Id.* at 297.

Brian made his decision to commit to UofL based on basketball reasons alone. That is, Brian had been advised by UofL coaches that he would promptly be in the Louisville starting lineup and would see immediate playing time. Meanwhile, Brian was unaware of the payment that the Adidas Schemers had promised his father.

From the perspective of the Adidas Schemers, it was essential to keep Brian in the dark about the bribe payment. And the Schemers needed to keep UofL in the dark as well. The Schemers needed to prevent public disclosure of the bribery not only to protect themselves from criminal liability, but also to keep Brian from being declared ineligible to play NCAA basketball. Put simply, a declaration of Brian's loss of NCAA eligibility would undermine the Adidas fraud and bribery scheme. Again, the scheme's primary purpose was to earn Adidas large sums of money by associating it with stellar college basketball players on the very best teams, such as UofL.[3]

3.

In July of 2017, about a month after Brian committed to UofL, the Adidas Schemers began coordinating by text and phone to make a $25,000 first installment on the bribe payment to Brian's father. They soon faced difficulties, however, in implementing their plan to funnel Adidas's money through an AAU team, the "Karolina Khaos" in South

---

[3] Brian's father confirmed under oath — in testifying for federal prosecutors in a 2019 criminal trial of three of the Adidas Schemers in New York — that he had hidden the bribery effort from Brian. And he had done so because of the danger that Brian would be declared ineligible to play NCAA basketball.

24

Carolina. Lacking sufficient funds and not knowing that they were then being actively investigated by the FBI, Schemers Dawkins and Sood borrowed $25,000 in cash from an undercover FBI agent. On July 13, 2017, $19,400 of that cash hoard was delivered by Sood to Brian's father.[4]

Less than a month thereafter, on August 1, 2017, through the use of fraudulent invoices (fake expense reports) sent by email, the Karolina Khaos received a $30,000 wire transfer from Adidas. And on the very day of the Adidas payment to the Karolina Khaos, a $25,000 check from the Karolina Khaos was issued to Dawkins. The payment to Dawkins was meant to be used to repay the cash loan made to Dawkins and Sood by the undercover FBI agent.

Around the same time, the Adidas Schemers planned to engage in a similar fraudulent process and make a second installment on the bribe payment to Brian's father. Before the next installment could be paid, however, several of the Schemers were arrested on criminal charges in the Southern District of New York. Those charges were lodged against five Schemers — Gatto, Dawkins, Sood, and Gassnola, and Code — and publicly revealed on September 25, 2017.

On November 22, 2017, after public disclosure of the Adidas fraud and bribery scheme and the payment promised to Brian's father, UofL declared Brian ineligible to play

_____

[4] The sum of $5,600 was skimmed by the Adidas Schemers from the $25,000 cash loan made by the undercover FBI agent. Of that $5,600, $2,600 was used for flight expenses of the Schemers, and the other $3,000 was deposited into a Dawkins bank account.

NCAA basketball and banned him from practicing or playing basketball there. Under the NCAA rules, UofL's decision to declare Brian ineligible meant he was barred from playing any college basketball, unless the NCAA reinstated him at the request of a member institution.

Seeking to salvage his basketball career, Brian transferred to the University of South Carolina, which had offered to request his reinstatement. On May 25, 2018, the NCAA declined to reinstate Brian. During the process of challenging the loss of his NCAA eligibility, Brian hired a lawyer and incurred more than $28,000 in fees and costs. Being denied the opportunity to utilize his athletic labor in NCAA basketball, Brian played in minor basketball markets — particularly in Australia — and was never drafted by the NBA.[5]

B.

Ultimately, the five indicted Adidas Schemers were convicted of criminal offenses in the Southern District of New York. Gatto, Dawkins, and Code were convicted after a jury trial in January 2019, and Sood and Gassnola pleaded guilty. Gatto was convicted of two wire fraud offenses under 18 U.S.C. § 1343, plus conspiracy to commit wire fraud. Dawkins and Code were each also convicted of § 1343 wire fraud, plus conspiracy to commit wire fraud. Sood was convicted of bribery, conspiracy to commit bribery, and conspiracy to commit wire fraud, and Gassnola was convicted of conspiracy to commit wire fraud alone. Each of the charges of conspiracy to commit wire fraud alleged that an

---

[5] Brian briefly played in the NBA on contracts that allow undrafted players to join NBA team rosters on a short-term basis.

26

object of the Schemers' conspiracy was the coverup of bribe payments made to the families of student-athletes.  The victims of the criminal offenses were specified as the defrauded universities, including UofL.

In the sentencing proceedings in March 2019, however, the New York district court recognized the adverse impact and serious injuries that the Adidas Schemers had inflicted upon Brian and the other college basketball players.  Strikingly, it was Brian who the court emphasized and singled out.  The veteran and distinguished presiding jurist, Judge Kaplan, pronounced that "probably the worst victim, [the] most seriously injured victim, of the Louisville scheme was [Brian] Bowen." *See United States v. Gatto*, No. 1:17-cr-00686, at 39 (S.D.N.Y. Mar. 11, 2019), ECF No. 297 (the "N.Y. Sentencing Transcript").[6]

Gatto, Dawkins, and Code appealed their convictions and sentences to the Second Circuit.  Resolving those appeals, the court of appeals affirmed the convictions and sentences of each defendant. *See United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021).  As the court related, the defendants "admitted [at trial] that they engaged in the scheme and broke NCAA rules, but argued that what they did was not criminal." *Id.* at 110.  On appeal, the defendants reiterated that they intended to help, rather than defraud, the universities "by bringing them top recruits to ensure winning basketball programs." *Id.*

---

[6] Of the five Adidas Schemers convicted in the New York proceedings, Gatto received the most substantial punishment, that is, a prison term of nine months.  Dawkins and Code each received six months.  Sood and Gassnola, who testified for the prosecution and pleaded guilty, were treated more leniently.

27

C.

Repetition generally being helpful to explaining a complex multi-party conspiracy, the pertinent facts relating to the fraud and bribery scheme and Brian's innocent role therein are partially summarized:

- The Adidas Schemers had a compelling financial interest in having Brian play basketball for UofL;

- The Schemers planned to make a $100,000 payment, in multiple cash installments, to Brian's father — without Brian's or UofL's knowledge — to secure Brian's commitment to play basketball for UofL;

- Brian thereafter committed to UofL, where, pursuant to the UofL Agreement, he expected to exchange his athletic labor for college basketball coaching and playing experience, plus a scholarship covering four years of tuition and other costs;

- Brian's decision to commit to UofL was based solely on basketball reasons, and not on the Schemers' promise of a payment to his father;

- It was an essential aspect of the fraud and bribery scheme that neither Brian nor UofL would know of the bribe payment;

- UofL and Brian had no knowledge of the fraud and bribery scheme until the September 2017 arrests of several Schemers;

- Upon disclosure of the fraud and bribery scheme, UofL declared Brian to be ineligible to play NCAA basketball; and

- As recognized by the New York district court, Brian was "probably the worst victim, [the] most seriously injured victim, of the Louisville scheme."

28

II.

A.

In November of 2018, Brian Bowen, II initiated this lawsuit against the Adidas Schemers in the District of South Carolina, principally seeking damages with respect to the fraud and bribery scheme. The operative Amended Complaint was filed in August 2019, after the New York trial and sentencing proceedings of several Schemers had been concluded. *See Bowen v. Adidas Am. Inc.*, No. 3:18-cv-03118 (D.S.C. Aug. 23, 2019), ECF No. 84 (the "Complaint"). In the Complaint, Brian alleges four civil RICO claims under § 1964(c) of Title 18 based on violations of subsections (a), (c), and (d) of § 1962, including both substantive and conspiracy offenses.[7]

The Adidas Schemers promptly filed a motion to dismiss the Complaint, arguing to the district court in South Carolina that Brian cannot satisfy RICO's injury and causation requirements under § 1964(c). In setting forth those requirements, § 1964(c) limits a civil RICO recovery to "[a]ny person injured in his business or property by reason of a violation of section 1962." *See* 18 U.S.C. § 1964(c).[8] In February 2020, the court rejected the

---

[7] Section 1964(c) provides for a damages recovery by a successful RICO plaintiff that is "threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *See* 18 U.S.C. § 1964(c). That provision provides a mix of compensatory and punitive damages to a successful RICO plaintiff. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003).

[8] As the panel majority recognizes, some federal courts have used the term "standing" to refer to RICO's injury and causation requirements. The use of "standing" in that way is somewhat of a misnomer, however, and should not be confused with constitutional standing to sue.

29

Schemers' dismissal effort, but advised the parties and counsel that the Schemers could reassert their contentions as to the injury and causation requirements after discovery was completed.

The parties thereafter engaged in extensive discovery proceedings. Multiple depositions were taken and approximately 300,000 documents were exchanged. Among the various depositions, Brian and his father were each examined.

Of significance, the discovery proceedings included a report from an expert named Michael Bratz, who had 36 years of experience in the NBA as a player, coach, scout, and manager. Bratz's unchallenged opinions included his view that "NCAA basketball is the proving ground for a player's career," and that "[t]here is no other comparable product in North America where a player can get premium training and acquire experience playing against the best players in their age group." *See* J.A. 1218. Describing UofL in particular, Bratz related that

> Louisville is a top tier basketball program, one of the blue blood schools in the nation. It is a place where elite prospects want to play. Louisville is a member of the Atlantic Coast Conference, the ACC, one of the best basketball conferences in the country. The team plays its home games in the state of the art KFC Yum! Center, which seats 22,090 fans, the 3rd largest arena in college basketball. Forbes Magazine ranked the Louisville basketball program as the most valuable in college basketball. No college basketball team makes more money.

*Id.* at 1208. Bratz also opined that, had Brian not lost his NCAA eligibility, he "would have been a first round pick in the NBA draft." *Id.* at 1219. But because of the NCAA eligibility bar, Brian "missed 18 months of competition after high school," i.e., the period of development "that is critical to a young player. *Id.* Moreover, Brian was deprived of

30

college coaching — a "level of coaching that . . . can't be matched anywhere else" — and he "wasn't able to play against the best competition and improve his basketball skills." *Id.* According to Bratz's expert evidence, Brian's loss of NCAA eligibility was accompanied by the loss of highly valuable college basketball coaching and playing experience.

Following the discovery proceedings, the Adidas Schemers moved the district court for an award of summary judgment. In pursuing that motion, they again contended that Brian cannot satisfy RICO's injury and causation requirements. In response, as to the injury requirement, Brian asserted multiple injuries to a business or property interest. Those included the loss of his NCAA eligibility, as well as the loss of the contractual benefits of college basketball coaching and playing experience that he expected to receive under the UofL Agreement.

In May 2021, the district court filed its Memorandum Opinion and Order awarding summary judgment to each of the Schemers, ruling therein that Brian has not sustained a qualifying injury. *See Bowen v. Adidas Am. Inc.*, No. 3:18-cv-03118, at 8-14 (D.S.C. May 26, 2021), ECF No. 265. For its conclusion that Brian's loss of NCAA eligibility does not constitute an injury to a business or property interest under RICO, the court invoked authority "in the due-process context" that "flatly reject[ed] the notion that student-athletes' expectations of future athletic careers are constitutionally protected" or that there is "a constitutionally protected property interest in intercollegiate athletic competition." *Id.* at 10. Additionally, with respect to the loss of contractual benefits under the UofL Agreement, the court determined that because the Agreement made no explicit promise of college basketball coaching and playing experience, Brian had a mere expectancy interest

31

in those lost benefits that cannot satisfy RICO's injury requirement.  Finally, although it criticized Brian's theory of causation, the court declined to decide whether he can satisfy RICO's separate causation requirement, as its ruling on the injury requirement was "fatal to his RICO claims."  *Id.* at 14-15.

### B.

Less than a month thereafter — on June 21, 2021 — the Supreme Court handed down its landmark decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021).  The *Alston* plaintiffs were NCAA Division I basketball and football players who initiated a federal antitrust action against the NCAA in California to contest its restrictions on student-athlete compensation as violative of the Sherman Act.  *Id.* at 2151.  That is, the plaintiffs challenged the "NCAA rules that limit the compensation they may receive in exchange for their athletic services."  *Id.* (internal quotation marks omitted).  The unanimous *Alston* Court affirmed the judgment of the California district court that certain restrictions on benefits that NCAA member schools can provide to student-athletes contravene the antitrust laws.

In so ruling, it was significant to the Supreme Court that the NCAA accepted "that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."  *See Alston*, 141 S. Ct. at 2156.[9]  As the Court explained, the NCAA did not dispute the proposition "that

---

[9] In an economic monopsony, a single buyer controls and dominates the demand for goods and services.  *See Alston*, 141 S. Ct. at 2154.  In a monopoly, on the other hand, a single seller retains the control.  *Id.*

32

student-athletes have nowhere else [other than NCAA member schools] *to sell their labor*." *Id.* (emphasis added). Or, in the words of the California district court, the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball," such that there are no "viable substitutes." *Id.* at 2152 (quoting *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067, 1070 (N.D. Cal. 2019)).

Largely relying on the Supreme Court's *Alston* decision, Brian and his counsel sought the South Carolina district court's reconsideration of its summary judgment award to the Adidas Schemers in these proceedings. Brian argued in his motion for reconsideration that, inter alia, *Alston* "confirm[ed] that Division I athletes have valuable business and property interests in their NCAA eligibility." *See Bowen v. Adidas Am. Inc.*, No. 3:18-cv-03118, at 1 (D.S.C. July 6, 2021), ECF No. 274. The motion underscored that Sherman Act claims are subject to an injury requirement like RICO's — allowing an antitrust claim to be brought by "any person who shall be injured in his business or property," *see* 15 U.S.C. § 15(a) — yet neither the NCAA nor any court, including the Supreme Court, questioned whether the *Alston* plaintiffs had sustained a qualifying injury to a business or property interest. According to the motion, the district court consequently erred in ruling that Brian's loss of NCAA eligibility is not an injury to a business or property interest in satisfaction of RICO's injury requirement.

Nevertheless, by its Memorandum Opinion and Order of August 2021, the district court denied Brian's motion for reconsideration. *See Bowen v. Adidas Am. Inc.*, No. 3:18-cv-03118 (D.S.C. Aug. 20, 2021), ECF No. 286. Regarding the Supreme Court's *Alston* decision, the district court determined that *Alston* "did not address, let alone change, the

33

law on [RICO's injury requirement] or whether NCAA eligibility is a business or property interest." *Id.* at 8. Accordingly, the court rejected *Alston* as a basis for reconsideration and denied Brian any relief.

C.

On appeal, Brian challenges both the district court's award of summary judgment to the Adidas Schemers and its denial of reconsideration in the wake of the Supreme Court's *Alston* decision. Our panel majority has decided to affirm, agreeing with the district court that Brian cannot satisfy RICO's injury requirement, without ruling on whether he can make a sufficient showing of causation.

With respect to Brian's loss of NCAA eligibility, the panel majority reasons that it is not a cognizable property injury in that, "[a]lthough eligibility may be valuable to the individual student-athlete, it is not property." *See ante* at 14-15. The majority further reasons that Brian's loss of NCAA eligibility is not a cognizable business injury in that, "despite losing his eligibility, he continued to receive the maximum compensation allowed at that time to a student-athlete: a full scholarship." *Id.* at 15. It is on that basis that the majority distinguishes *Alston* and deems it wholly unhelpful to Brian. As the majority explains:

> In *Alston*, the student-athletes (whose eligibility was not in question) claimed NCAA rules unlawfully limited the compensation they could receive for their labor. Lost compensation is a concrete injury to business or property. [Brian], however, does not assert the loss of compensation for services rendered playing NCAA basketball — after all, he continued to receive the maximum compensation allowed and does not challenge the NCAA compensation limits that applied to him. Rather, he asserts the loss of his

34

eligibility to participate in the NCAA labor market, untethered to any concrete interest like compensation.

*Id.* at 16-17 (citations omitted).

Relatedly, the panel majority acknowledges Brian's argument "that losing his NCAA eligibility prevented him from playing college basketball, thereby improving his basketball skills, and increasing his prospects of being selected in the NBA draft." *See ante* at 17. The majority concludes, however, that — unlike lost compensation — "[t]his is not the sort of tangible business loss that supports a RICO cause of action." *Id.* In so doing, the majority emphasizes that Brian "did not have an existing or prospective business relationship with any NBA team," while nonetheless insisting that the problem for Brian is "the nature of the loss" rather than a lack of "evidence demonstrating his expectancy [of a profitable professional basketball career]" or a failure "to articulate the damages flowing from his claimed injury." *Id.* at 17-18.

Of course, I see things differently. For the reasons explained below, I would rule that Brian's loss of NCAA eligibility satisfies RICO's injury requirement.[10]

---

[10] In light of my view that Brian's loss of NCAA eligibility constitutes a qualifying injury to a business or property interest, I have not unnecessarily considered whether the loss of contractual benefits he expected to receive under the UofL Agreement — specifically, college basketball coaching and playing experience — also constitutes such an injury. Like the district court, however, the panel majority has concluded that Brian cannot show a qualifying injury based on the lost contractual benefits because the UofL Agreement did not explicitly promise them.

III.

In § 1964 of Title 18, which is entitled "Civil remedies," the Criminal Code spells out four statutory subsections that govern the conduct of civil RICO proceedings. Subsection (c) thereof is important here, in that it identifies the elements of a civil RICO claim. Generally, in order to establish a civil RICO claim, a plaintiff must show the following:  (1) a violation of RICO, specifically 18 U.S.C. § 1962; (2) an injury to a business or property interest; and (3) that the injury was caused by the RICO violation. *See Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988) ("To make out a civil action for damages under the RICO statute a private plaintiff must demonstrate not only that the defendants have violated § 1962, but also that he has been 'injured in his business or property by reason of [the alleged] violation of section 1962.'" (alteration in original) (quoting 18 U.S.C. § 1964(c)).

A.

The second element of a civil RICO claim, the injury requirement, is where the district court and the panel majority have focused. RICO's injury requirement is derived from the statute itself, which limits a RICO civil remedy to "[a]ny person *injured in his business or property*." *See* 18 U.S.C. § 1964(c) (emphasis added).

Among the injuries alleged by Brian, I readily and easily see his loss of NCAA eligibility as a qualifying injury to a business or property interest. And that is because, as the Supreme Court recently related in its *Alston* decision, the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball," and "student-athletes have nowhere else [other than NCAA member schools] *to sell their labor*." *See*

36

141 S. Ct. 2141, 2152, 2156 (2021) (internal quotation marks omitted) (second emphasis added). In other words, without NCAA eligibility, a young athlete has absolutely no market for his athletic labor. Consequently, that athlete most certainly has a business or property interest in his NCAA eligibility. Indeed, it is absurd to say that a person can be left without a market for his labor without sustaining a business or property injury.

Yet the panel majority says just that, reasoning that Brian suffered no "concrete injury" such as lost compensation (as he "continued to receive the maximum compensation allowed at that time to a student-athlete: a full scholarship"). *See ante* at 15-17. The majority acknowledges Brian's loss of college basketball coaching and playing experience, but deems that loss to be "not the sort of tangible business loss that supports a RICO cause of action" (particularly since he "did not have an existing or prospective business relationship with any NBA team"). *Id.* at 17.

The panel majority's fundamental error is its failure to appreciate that Brian's scholarship was only part of the compensation he received from UofL in exchange for his valuable athletic labor. Of great significance to Brian, he was also compensated with college basketball coaching and playing experience. Brian has been clear that he did not commit to UofL simply to obtain a scholarship and pursue an academic degree. Rather, he committed to UofL because he would be compensated with, inter alia, elite coaching and immediate playing time that would prepare him for a career in the NBA. That compensation was exceedingly valuable to Brian — regardless of whether he had an existing or prospective NBA contract — and it was something Brian was actively receiving before he was stripped of his NCAA eligibility. But along with the NCAA eligibility bar,

37

Brian lost all compensation in the form of college basketball coaching and playing experience, thereby suffering a "concrete" and "tangible business loss" in satisfaction of RICO's injury requirement.[11]

There is ample support for the proposition that college basketball coaching and playing experience constituted valuable compensation to Brian, including the expert evidence of Michael Bratz. Based on his 36 years of NBA experience, Bratz described NCAA Division I basketball as "the proving ground for a player's career," where the player would receive an unmatched "level of coaching" and would be "able to play against the best competition and improve his basketball skills." *See* J.A. 1218-19.[12]

Moreover, the value of Brian's lost college basketball coaching and playing experience was obviously apparent to the New York district court in the Adidas Schemers' federal criminal proceedings. That is, Judge Kaplan pronounced at sentencing that "probably the worst victim, [the] most seriously injured victim, of the Louisville scheme

---

[11] That is not to say Brian had a contractual or constitutional right to college basketball coaching and playing experience. But it cannot be disputed that he agreed to provide his athletic labor in exchange for such compensation, and one need not have a contractual or constitutional right to compensation in order for its loss to satisfy RICO's injury requirement. Indeed, as the Supreme Court has instructed, "RICO is to be read broadly." *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985) (underscoring "Congress' self-consciously expansive language and overall approach," as well as "its express admonition that RICO is to be liberally construed to effectuate its remedial purposes" (internal quotation marks omitted)).

[12] Although the Adidas Schemers indicated in the district court that they intended to move to exclude Bratz from testifying at trial, they relied in the summary judgment proceedings on aspects of Bratz's expert report that they deemed to be helpful to them. As such, it is appropriate to consider the report herein. *See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538-39 (4th Cir. 2015).

38

was [Brian] Bowen." *See* N.Y. Sentencing Transcript 39. And the court did not perceive Brian to be unharmed because he kept his UofL scholarship.

The Supreme Court's *Alston* decision similarly evinces an understanding that — despite the NCAA's limits on other forms of compensation — many student-athletes opt to provide their athletic labor to universities for the coaching and playing experience that they can get in return. As the *Alston* Court recognized, "the NCAA enjoys near complete dominance of, and exercise[s] monopsony power in," the market for athletic labor in basketball and football. *See* 141 S. Ct. at 2151-52 (internal quotation marks omitted, alteration original). At the same time, NCAA Division I schools are able to attract "the most talented athletes." *Id.* at 2150 (internal quotation marks omitted). And the NCAA has been able to do those things while "restrain[ing] student-athlete compensation." *Id.* at 2152 (internal quotation marks omitted). Plainly, that is because there are student-athletes — particularly those aspiring to professional athletic careers — who see great value in coaching and playing experience that they cannot obtain anywhere else.[13]

---

[13] According to Brian, the *Alston* precedent further suggests that he can satisfy RICO's injury requirement because no court, including the Supreme Court, questioned whether the *Alston* plaintiffs satisfied the similar injury requirement for their Sherman Act claims. *See* 15 U.S.C. § 15(a) (allowing an antitrust claim to be brought by "any person who shall be injured in his business or property"); *see also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (explaining that, because Congress "used the same words" for the injury requirements in 18 U.S.C. § 1964(c) (RICO) and 15 U.S.C. § 15(a) (antitrust), "we can only assume it intended them to have the same meaning"). I do not delve into that theory because *Alston* otherwise establishes Brian's loss of NCAA eligibility as a qualifying injury to a business or property interest.

To be sure, it may be difficult to assess the specific damages that Brian has suffered as a result of his NCAA eligibility bar and the accompanying loss of college basketball coaching and playing experience. But even the panel majority recognizes that any failure "to articulate the damages flowing from his claimed injury" is not a problem for Brian, *see ante* at 17-18, and at least on that point I agree with my colleagues. As our Court has recognized, 18 U.S.C. § 1964(c) authorizes a civil RICO claim by "'any person injured in his business or property,' not any person who can quantify the amount of the injury." *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001). For it is "[t]he best reading of § 1964(c)'s injury to business or property requirement . . . that it refers to the fact of injury and not the amount." *Id.*[14]

At bottom, when Brian lost his NCAA eligibility, he was grievously "injured in his business or property." *See* 18 U.S.C. § 1964(c). It takes a tortured reading of the term "business or property" to maintain that the term does not include Brian's ability to participate in the sole market for his athletic labor and to obtain valuable compensation in the form of the elite coaching and playing experience offered nowhere but an NCAA Division I basketball program.

---

[14] An aspect of his damages that Brian does quantify is the more than $28,000 in attorney's fees and costs he incurred in challenging the loss of his NCAA eligibility. The panel majority rules that those expenses are unrecoverable "pecuniary losses flowing from a non-cognizable injury." *See ante* at 18. But because I see Brian's loss of NCAA eligibility as a qualifying injury, I would allow him to recover the attorney's fees and costs along with other damages.

B.

Finally, although the district court and the panel majority have not ruled on the other elements of a civil RICO claim, I believe they merit brief discussion. Notably, the Adidas Schemers have not even argued that they are entitled to summary judgment based on an insufficient showing on the first element, i.e., a RICO violation. I am confident that is because Brian has compelling evidence to support his allegations of violations of subsections (a), (c), and (d) of 18 U.S.C. § 1962. For example, central to each of the alleged RICO violations is proof of a "pattern of racketeering activity," which is defined in § 1961 of Title 18 as "at least two acts of racketeering activity" that may include wire fraud under 18 U.S.C. § 1343 and bribery. Those are some of the very crimes that the Schemers were convicted of committing in the Southern District of New York.

As for the third element of a civil RICO claim — the causation requirement — the Schemers have raised it as an alternative basis for summary judgment. Specifically, the Schemers argue that they are entitled to summary judgment because Brian cannot make the mandatory showings of "but for" and proximate causation. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (explaining that, in order to satisfy the causation requirement, a plaintiff must show "that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well").

According to the Schemers, Brian cannot show that any of their RICO violations was a "but for" cause of his loss of NCAA eligibility because — by the time the first installment of their bribe payment was delivered to his father in July 2017 — Brian had been rendered ineligible to play NCAA basketball due to earlier violations of NCAA

41

amateurism rules that occurred while he was in high school.  The Schemers interpose that ground for summary judgment notwithstanding that the alleged violations of the amateurism rules went undiscovered and have never been the basis for an ineligibility determination by the NCAA or an NCAA member school (and despite that Brian contests that the alleged violations occurred as a matter of both fact and interpretation of the relevant amateurism rules).

Meanwhile, the Adidas Schemers contend that Brian cannot establish proximate cause because it was the discovery that the Schemers had bribed Brian's father — and not the bribe itself — that injured Brian, by resulting in UofL's declaration of his ineligibility to play NCAA basketball.  Without support from any controlling authority, the Schemers argue that "a plaintiff's claimed harms are indirect if they were caused by reason of the fraud's discovery, not the fraud itself."  *See* Br. of Appellees 47 (internal quotation marks omitted).

Strikingly, the Adidas Schemers' proximate causation argument (that Brian's injury was caused *by the discovery of the bribe*, not the bribe itself) is directly at odds with their "but for" causation argument (that Brian was already ineligible to play college basketball by the time the first installment of the bribe was paid, on account of prior NCAA rules violations *that had not then been discovered*).  Suffice it to say I am not at all impressed with those "heads I win, tails you lose" theories as to RICO's causation requirement.  In any event, I adamantly disagree with the rulings of the district court and the panel majority that the Schemers are entitled to summary judgment based on Brian's failure to satisfy the injury requirement.

42

IV.

Pursuant to the foregoing, I would vacate the district court's award of summary judgment to the Adidas Schemers and remand for further proceedings. I therefore respectfully dissent.